ERNEST W. ALY v. TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, a Corporation, Appellant.—119 S. W. (2d) 363.

Division Two, August 17, 1938.

*T. M. Pierce, J. L. Howell* and *Walter N. Davis* for appellant.

*Wm. H. Allen* for respondent.

1120

WESTHUES, C.—Respondent, Aly, obtained a judgment against appellant, Railroad Company, in the sum of $85,000, as damages for personal injuries sustained while engaged as a switchman in the Terminal Yards at St. Louis, Missouri. The railroad association duly appealed.

This case was here on a former appeal. [See Aly v. Terminal Railroad Assn. of St. Louis, 336 Mo. 340, 78 S. W. (2d) 851.] In the first trial there was a verdict for the defendant and this court ordered a new trial because of erroneous instructions given on behalf of the defendant. After the case was remanded, a second trial resulted in a verdict for plaintiff in the sum of $55,000. The trial court ordered a new trial unless plaintiff entered a *remittitur* in the sum of $25,000, which plaintiff refused to do. The third trial resulted in a verdict for plaintiff in the sum of $85,000 and the trial court denied the railroad a new trial, hence, this appeal.

Plaintiff was a switch foreman. On October 25, 1929, at about eleven-thirty A. M., the crew of which he was a member was switching cars in making up passenger trains destined for Pittsburgh, Pennsylvania, and other points outside of this State. We decided on the former appeal that plaintiff was engaged in work directly connected with interstate transportation. That fact is not disputed on this appeal. Plaintiff's suit is based on a violation of the Federal Boiler Inspection Act (45 U. S. C. A., sec. 22, etc.). The engine which ran over plaintiff was being used in switching movements, and at the time was drawing three cars to be placed with an interstate train. The cars were coupled to the head of the engine and the engine was backing toward a switch. Plaintiff attempted to get on the footboard,

located at the right side of the tank of the engine, intending to ride to the switch. The train was moving about ten miles per hour and plaintiff tried to board it as it was coming toward him. He failed in the attempt and the engine ran over him cutting off both of his legs. Plaintiff testified that as he stepped on the footboard it slipped toward the coupler or drawbar and threw him under the train. On this appeal plaintiff's evidence on this point was substantially the same as on the former appeal. Plaintiff alleged that the footboard was defective so as to permit it to slip and that this was the direct cause of his injuries. We learn from the evidence that there was a large wooden beam beneath the rear end of the tank. Four "L" shaped metal straps, called hangers, were bolted to this beam, two on each side of the coupler. A board was fastened on the metal straps, one on each side of the coupler. These footboards were about nine inches above the rails. An iron rod extended from one footboard to another and was placed there for the purpose of holding the air hose. The rod also served as a brace for the footboards. The bolts which fastened the metal straps to the wooden beam were seven-eighths of an inch in diameter. The beam was twelve inches wide and fourteen inches thick. The hangers were one inch thick and four inches wide. There was a conflict in the evidence as to the size of the holes in the wooden beam. Plaintiff introduced substantial evidence that the holes in the wooden beam were one and three-eighths inches and the holes in the straps one and one-eighth inches in diameter. Defendant introduced substantial evidence that the holes in the beam were one and one-eighth inches, the same as in the metal hangers. Defendant also introduced evidence that the bolts were held by two nuts, one of which was a lock or jam nut intended to prevent the footboard from becoming loose. At the former trial plaintiff claimed that the holes in the beam and metal straps had become larger, due to long usage and wear. At this trial plaintiff amended his petition by striking out the allegation that the holes were worn, leaving the charge that the holes were much larger than the bolts, thus permitting the footboard to move or sway. Defendant introduced evidence tending to prove that if the nuts on the bolts were drawn tight it was impossible for the footboard to sway or move from side to side. A number of defendant's witnesses testified that even if the nuts on the bolts were loose the footboard could be shifted from side to side but very little, perhaps one-fourth of an inch.

Plaintiff testified as follows as to the shifting of the footboard:

"Q. Then you got inside the track, just inside track 7, just next to the north rail? A. Yes, sir, that's correct.

"Q. And the train was coming towards you at ten miles an hour? A. In my estimation it was coming to me at ten miles an hour.

"Q. And you raised your foot to step on the footboard? A. Yes, sir, I raised my right foot.

"Q. Your right foot? A. Yes, sir.

"Q. Now, did you step on the foot board? A. I hit the board, I hit it right with the instep of my shoe, and I got almost straight on that board when the board slipped toward the drawbar; it throwed me off of my balance and under the wheels.

"Q. I think you said it slipped about an inch? A. That's what I said, yes, sir.

"Q. Now, that right rear footboard was attached to the end sill, wasn't it? A. Yes, it was fastened on with two straps; yes, sir.

"Q. When you hit this board, it didn't slip back, did it? A. I said it slipped south, towards the drawbar; in other words, the coupler.

"Q. It slipped toward the coupler? A. The coupler, yes, sir."

"Q. When you got up in almost this upright position, you say, did you grab for the grab-iron? A. I didn't get the grab-iron. I didn't get the grab-iron.

"Q. You didn't get it? A. No, because the board slipped and throwed me; that's why I didn't get it. I was almost in an upright position, though.

"Q. Almost in an upright position? A. Yes, sir."

Plaintiff also introduced evidence, by other witnesses, that the footboard would sway from side to side if the nuts were loose or if the holes in the beam and straps were too large. A witness, who had had many years experience in repair work on engines and cars, testified for plaintiff that the holes in the wooden beam should be only one-sixteenth of an inch larger than the bolts, and the holes in the iron hangers should be only one-thirty-second of an inch larger than the bolts. This witness examined the footboard in question. He testified that the bolts were beginning to shear, indicating that the nuts had been loose permitting vibration and causing the bolts to wear at the point where they passed through the metal straps; that if the nuts were drawn tight on the bolts there would not be any shearing of the bolts.

Defendant's theory of the case is, that no defect existed in the footboard; that the holes in the beam and metal straps were the proper size; that the double nuts on the bolts prevented them from getting loose through vibration; and, that the footboard, as constructed, could not sway from side to side. Defendant introduced substantial evidence to sustain all of these matters. The engineer of the crew and others testified that the footboard was examined and tested after plaintiff was injured and it was found to have been in good condition. Defendant also introduced evidence that the engine was taken to the shop at the usual time, about three o'clock in the afternoon, and a further and thorough examination was made which disclosed that no defect or looseness of the footboard existed. Reports, which were made in the usual course of business, were introduced in evidence and

indicated that the footboard had not been reported out of order and had not been repaired.

Appellant's contention is, that the evidence of plaintiff was not sufficient to sustain the verdict. We ruled on the former appeal that plaintiff made a case for the jury and we are constrained to adhere to that opinion. Appellant also asserts that the evidence of plaintiff was so infinitesimal, as compared with the evidence of the defendant, that the judgment ought to be set aside. Appellant cites a number of cases, some decided by the United States Supreme Court, in support of this theory. The rule of law universally accepted, however, is, that if a plaintiff introduces substantial evidence to support a disputed fact, a finding for him by a jury is binding on appellate courts, even though the defendant introduces many more witnesses and a much greater volume of evidence tending to prove the contrary. In other words, the weight of the evidence and the credibility of the witnesses are for the jury. [Henry v. Cleveland, C., C. & St. L. Railroad Co., 332 Mo. 1072, 61 S. W. (2d) 340, l. c. 342 (6).] That is also the Federal rule. There may be a difference of opinion now and then as to what constitutes substantial evidence, but where an appellate court finds that there is substantial evidence to support a disputed fact a jury finding thereon cannot be set aside without doing violence to our system of trial by jury. In the case of Gulf, Mobile & Northern Railroad Co. v. Wells, 275 U. S. 455, 48 Sup. Ct. 152, cited by appellant, the court said:

"In short, we find that on the evidence and all the inferences which the jury might reasonably draw therefrom, taken most strongly against the Railway Company, the contention that the injury was caused by the negligence of the engineer is without any substantial support. In no aspect does the record do more than leave the matter in the realm of speculation and conjecture. That is not enough. [Patton v. Texas & Pacific Railway, 179 U. S. 658, 663; Chicago, M. & St. P. Railway v. Coogan, 271 U. S. 478.]"

Our rule in this State is in harmony with that case. [See Fritz v. St. Louis, I. M. & S. Railroad Co., 243 Mo. 62, 148 S. W. 74, l. c. 78; McKeighan v. Kline's, Inc., 339 Mo. 523, 98 S. W. (2d) 555, l. c. 560 (6, 7); Warner v. St. Louis & M. R. Railroad Co., 178 Mo. 125, 77 S. W. 67, l. c. 69; Watkins v. Bird-Sykes Bunker Co., 322 Mo. 830, 16 S. W. (2d) 38, l. c. 43 (2, 3).] The evidence of plaintiff that the footboard slipped toward the drawbar, was direct evidence of a fact. If the footboard slipped, then, under all the evidence, there can be but one reasonable inference, that there was something out of order which permitted the footboard to slip. [Kimberling v. Wabash Railroad Co., 337 Mo. 702, 85 S. W. (2d) 736, l. c. 739.] Evidence of an immediate inspection after the injury, by the engineer, who found that the board was not loose, was proper for the jury's consideration but not binding on them. The situation is similar to a num-

ber of cases decided by this court. [See Henry v. Cleveland, C., C. & St. Louis Railroad Co., supra; Radler v. St. Louis-San Francisco Ry. Co., 51 S. W. (2d) 1011, 330 Mo. 968.] In the Henry case this court said:

"Witnesses for defendant testified that they inspected the brake chain, set and released the brake, and found nothing wrong with it, but, since plaintiff offered evidence tending to show inefficient operation of the hand brake, an issue of fact was raised, and the credibility of the witnesses and the weight and value to be given to their testimony were questions for the jury."

Appellant argues that the evidence disclosed that engines sway from side to side to some extent when rounding a curve or when passing over a frog or switch; that at the time plaintiff was injured the engine was rounding a curve; that, therefore, plaintiff could not know if the shifting of the footboard to the side was the result of the natural sway of the engine, or a shifting of the footboard upon the engine; that plaintiff evidently was not looking at the footboard. It is very probable that plaintiff's eyes were not focused on the footboard so that he could see it move to the side, but we cannot say, as a matter of law, that when plaintiff stepped upon the board he could not distinguish a shifting of the board itself from a swaying of the engine. There was no evidence upon this point, but common sense tells us that men working daily about railroad yards can distinguish one from the other.

Appellant also argues that plaintiff's evidence failed to show that he was charged with the duty of boarding the footboard, or that the footboard was put in the service for the purpose for which plaintiff used it. There was evidence that the footboards were supposed to be used by switchmen, as plaintiff testified: "As a rule I rode those footboards every day in the week." Plaintiff may have been negligent in attempting to board the engine coming toward him at ten miles per hour, but plaintiff's negligence was not a defense to his cause of action. If plaintiff's evidence, that the board slipped and caused him to fall, was true, then plaintiff's negligence was only a contributing cause of his injury and not the sole cause. The trial court gave an instruction telling the jury in substance, that if plaintiff was caused to fall in any other manner than by the swinging of the footboard on the bolts, toward the coupler, then plaintiff was not entitled to recover. The trial court gave a number of instructions along this same line, at defendant's request, informing the jury that plaintiff could not recover unless, from a preponderance of the evidence, the jury found that the footboard moved or swung on the bolts. The jury so found and we are bound by that finding.

Appellant offered to introduce in evidence a rule of the company which forbade switchmen to board engines coming toward them. The trial court refused to permit this rule to be introduced in evi-

**1126**

dence. Appellant has cited the case of Frese v. C., B. & Q. Railroad Co., 263 U. S. 1, 68 L. Ed. 131. In that case a statute of Illinois made it the duty of a locomotive engineer to stop his train at a crossing of another railroad and to positively ascertain that the way was clear before passing over the crossing. This the engineer failed to do and lost his life in a collision which followed. The court held that a violation of the statutory duty on the part of the engineer was the sole cause of the injury. Without deciding whether a violation of a rule of the company is a parity with a violation of a state statute, there is this distinction: In the Frese case the plaintiff relied upon the negligence of the fireman in failing to perform a duty which the statute imposed upon the engineer. In the case before us plaintiff was relying upon a defective appliance. So even if plaintiff violated a rule, that would be only a contributing cause and not the sole cause. In Spokane & I. E. Railroad Co. v. Campbell, 241 U. S. 497, the plaintiff had violated an order, and was injured through a defective air hose which caused a collision. In 241 U. S. 497, l. c. 508, the court said in speaking of the violation of the order:

"In its legal effect this was nothing more than negligence on his part. . . ."

The court further said in the concluding part of the opinion:

"But where, as in this case, plaintiff's contributory negligence and defendant's violation of a provision of the Safety Appliance Act are concurring proximate causes, it is plain that the Employers' Liability Act requires the former to be disregarded."

In the case under consideration the jury was explicitly instructed that plaintiff could not recover unless the footboard slipped toward the drawbar and caused plaintiff to fall. A violation of the rule, therefore, could at most have been only contributory negligence and not a defense. We must rule the point against appellant.

■ Appellant assigned error because a witness was permitted to testify that the footboard would swing if the nuts on the bolts were loose. Defendant introduced evidence that even if the nuts were loose the footboard could not swing. Appellant asserts that there was no evidence that the footboard was loose, hence, the evidence should not have been admitted. Plaintiff testified that the footboard slipped. That evidence justified an inference that the nuts were loose on the bolts. Both sides produced evidence upon this point and we are of the opinion that the evidence was admissible. Again appellant complained because a witness was permitted to testify that the metal straps had worn collars on the bolts, indicating that the nuts had been loose. This witness also testified that it would require a considerable length of time to cause that much wear on the bolts. Appellant insists that the collars on the bolts had nothing to do with the accident. This evidence was admissible to show that the foot-

board had been loose, and supported plaintiff's theory of the case. We deem it legitimate evidence for the consideration of the jury.

During the trial the regulations of the Interstate Commerce Commission, concerning the construction of footboards, were read to the jury. Appellant's attorney asked if there was any rule prescribing the size of the holes in the wooden beams, whereupon the attorney for plaintiff remarked in substance that engine number 59, here in question, was thirty or forty years old; that wooden beams were no longer in use; that the rules, therefore, could not cover the situation but common sense would. Appellant asked that the jury be discharged. This the court refused to do, but admonished the jury that they should disregard the statements of the attorney for plaintiff. While the conduct of plaintiff's attorney was not at all commendable, granting a new trial or discharging a jury for misconduct of attorneys during a trial lies largely within the discretion of the trial court. We do not deem the situation serious enough to overrule the action of the trial court.

Appellant produced in court a replica of the end beam and footboard and offered to demonstrate before the jury that the footboard could not sway sidewise upon the bolts. The trial court refused to permit the demonstration. Trial courts have a wide discretion in such matters. [22 C. J. 790, sec. 899.] The record does not disclose any abuse of this discretion.

Appellant also asserts that plaintiff's instruction, which submitted the case to the jury, assumed facts in dispute. We have carefully examined the instruction and do not find it subject to that criticism.

Lastly, appellant asserts that the verdict of $85,000 is grossly excessive. We are of the opinion that this contention must be sustained. We do not mean to say that any sum of money can fully compensate plaintiff for his injuries. No human being, in full possession of his mental faculties, would exchange his legs for $85,000, or any other sum, and endure the attending suffering, both mental and physical. Money may, however, provide the means of a livelihood and provide care and attention to ameliorate his suffering. Plaintiff's legs were severed above the knees. The evidence of a physician disclosed his condition about as follows: Plaintiff cannot wear artificial limbs because the nerves are exposed and the bones of the legs must be shortened so that a padding may be formed to protect the nerves; plaintiff is in such a helpless condition that he must be carried wherever he desires to go; he is extremely nervous and dejected and continues to suffer great pain both physically and mentally; plaintiff was forty-two years old when injured, five feet eleven inches tall, weighed 195 pounds and was in good health; he was earning $214 per month, but since his injury has been unable to perform any labor; his life expectancy was twenty-six and one-fourth years; plaintiff in his present condition will need a constant attendant; he

is a physical wreck, while before the injury he was a strong, healthy individual. We have examined many cases, those cited by appellant and respondent, as well as a number cited in 17 Corpus Juris, 1110, section 440, where the question of the amounts of verdicts is given special attention. Cases from various states, where the injuries consisted in the loss of both legs, are there cited. This examination has disclosed that instances are few indeed where verdicts have been approved in excess of $40,000 in personal injury cases. Considering plaintiff's loss of earnings, which he had sustained up to the time of the trial, that is, from October, 1929, to the time of the third trial, January, 1936, and considering that he must have an attendant or submit to an operation, which may or may not enable him to wear artificial limbs, we feel that gaging the situation in the light of the adjudicated cases, a judgment for $40,000 would not be excessive. For cases discussing amounts of verdicts see Bond v. St. Louis-San Francisco Railroad Co., 315 Mo. 987, 288 S. W. 777, 1. c. 784 (15), reduced from $85,000 to $35,000; Pulliam v. Wheelock, 319 Mo. 139, 3 S. W. (2d) 374, reduced from $50,000 to $30,000; Mann v. St. Louis-San Francisco Railroad Co., 72 S. W. (2d) 977, reduced from $40,-000 to $15,000; Span v. Jackson-Walker Coal & Mining Co., 322 Mo. 158, 16 S. W. (2d) 190, 1. c. 204 (33), verdict for $50,000 not reduced. In the Span case, speaking of plaintiff's injuries, the court said:

"The harrowing details of many cases involving grave personal injuries have been examined in vain to discover one in which the destructive effects of the injuries inflicted approached in magnitude those suffered by the plaintiff."

If, therefore, plaintiff will within ten days enter a *remittitur* in the sum of $45,000, the judgment will be affirmed for $40,000 with interest from the time when the judgment was entered in the circuit court. It is so ordered. *Cooley* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES C., is adopted as the opinion of the court. All the judges concur.