## TEXAS & P. RY. CO. v. CROWN.
### No. 2724.

Court of Civil Appeals of Texas. Eastland.
April 22, 1949.

Rehearing Denied May 13, 1949.

Wagstaff, Harwell, Wagstaff & Alvis, of Abilene, for appellant.

Smith & Smith, of Anson, and Scarborough, Yates, Scarborough & Black, of Abilene, for appellee.

GRISSON, Chief Justice.

In January, 1941, Pete Crown was traveling from his home in Fayetteville, Arkansas to Tucson, Arizona. He climbed on a box car of a Texas and Pacific Railway Company train moving westward out of the station at Monahans. He rode on the car for a few hundred yards and as he reached the top of a box car, according to his allegations and testimony, said company's rear brakeman cursed him, told him to get off and kicked him in the face, causing him to fall from the car and the wheels of the train to run over both of his legs, necessitating the amputation of one leg four inches below the knee and the other seven and one-half inches below the knee. He sued the railway company for damages and obtained a judgment for $50,000. The Railway Company has appealed.

The jury found (1) that as Crown was climbing aboard a freight train an employee of defendant kicked him; (2) that said employee was then acting within the scope of his employment; (3) that such act of defendant's employee was negligence; and (4) a proximate cause of Crown's injury; and, (8) that $50,000 would fairly and reasonably compensate Crown for the injury so sustained. Appellant's first four points assert (1) there was no evidence defendant's brakeman was acting within the scope of his employment when he kicked Crown; (2) that the un-

disputed evidence shows the brakeman was not acting within the scope of his employment; (3) that the court erred in submitting such issue to the jury, because the evidence was insufficient to warrant its submission; and, (4) that the answer to issue 2, that appellant's brakeman was acting within the scope of his employment when he kicked Crown, is contrary to and not supported by the evidence.

It is undisputed that Pete Crown was on the box car and that he fell from it and his legs were mangled by the wheels of the train, necessitating their amputation. The appellee and Jack Winkle, who was also a trespasser on the train, testified that Pete Crown was knocked off the car by a "brakeman on the train." G. W. Carpenter testified that he was in business a short distance from the scene of the accident and was the first person to reach Pete Crown after the accident; that he reached Crown within two minutes after his injury; that Crown had a skinned place on his cheek; that his legs were cut off and Crown then told him that a man kicked him off the train and he would remember his face in hell. Crown identified appellant's rear brakeman as the man who kicked him off the train. There was evidence that immediately after his injury, Crown said a brakeman kicked him off the train. It is undisputed that Mr. Crowder was defendant's rear brakeman on said train. He testified that his place on the train was ordinarily in the caboose on the back of the train. Appellee identified Crowder as the person who knocked him from the train. The train crew testified that Mr. Crowder, two other brakemen and the engineer and fireman were at said time in the cab of the engine; that they left the conductor at the station and were going west to the yard to leave some empty cars. Jack Winkle testified that he was on the car next to the one Pete Crown was riding; that "a brakeman on the train" kicked Pete Crown; that said brakeman had been on the train since "we left Big Spring and had been acting as a brakeman." He was asked whether the party who kicked Pete Crown "was a brakeman on the Texas and Pacific train that the young man had climbed upon." He answered: "Yes, I am sure that he was." He testified he heard the brakeman "bawling Pete Crown out," saw him strike Pete Crown and saw Crown fall and get his legs cut off; that immediately afterward Pete Crown was saying the brakeman kicked him off. He testified that before Pete Crown was struck he saw this brakeman walking back from the engine on top of the train; that after Pete Crown was kicked off the train he saw the brakeman go between the two cars where Pete Crown fell. Although the testimony that said brakeman was the man who knocked Pete Crown from the car is vigorously denied, that was clearly a question of fact and the jury has determined it against appellant.

Perhaps, the principal question to be decided is whether there is sufficient evidence to sustain the finding that defendant's brakeman was acting within the scope of his employment when he knocked appellee from the train. The rear brakeman, who was convicted by the jury of kicking Pete Crown off the car, testified, among other things, relative to whether he was then acting within the scope of his employment, as follows:

"Q. Now, you customarily have some guys that ride on your freight trains for free, don't you? A. Sure.

"Q. You recognize the fact that they do ride there, and know it, don't you; you know that don't you? A. I know they are people riding.

"Q. And it is part of your duties, as brakeman for the Railroad to keep some of those guys off of there, isn't it? A. We tell them to, yes, sir.

"Q. In other words, to safeguard the railroad property and the stuff that you are hauling, why there are times when you make those hobos, as you call them, get off of the train; that's right? A. Yes, sir.

"Q. And that comes under the head of being a part of your duties? A. Yes; usually we tell them to stay off.

"Q. And you are supposed to do that, aren't you? A. Yes, sir."

A railway brakeman has no implied authority to eject a trespasser from his train. 35 Tex.Jur. 644. Such authority is usually possessed by the conductor, but, no conductor was on the train when Crown was injured. The burden was upon appellee to show that when the brakeman kicked him off the train he was acting within the scope of his employment. He had the burden of showing that the brakeman was acting in furtherance of his master's business and for the accomplishment of the object for which he was employed.

"To hold the master liable for the act of his servant, it is not necessary that the servant should have authority to do the particular act. The act of the servant may be contrary of his express orders, and yet the master may be liable. But the act must be done within the scope of the general authority of the servant.

\* \* \* \* \* \*

"For the mode in which the servant performs the duty he is engaged to perform, if wrongful, and to the injury of another, the master is liable, although he may have expressly forbidden the particular act." International & G. N. R. Co. v. Anderson, 82 Tex. 516, 17 S.W. 1039, 1040, 27 Am. St.Rep. 902. See also Texas & P. R. Co. v. Mother, 5 Tex.Civ.App. 87, 24 S.W. 79, writ ref.; Kansas City, M. & O. R. Co. v. Torres, Tex.Com.App., 57 S.W.2d 1099.

"While the determination of what conduct is within the scope of a servant's employment or authority is necessarily largely dependent on the facts and circumstances of the particular case, generally whatever is done by the employee in virtue of his employment and in furtherance of its ends is deemed to be within the scope of his employment." 57 C.J.S., Master and Servant, § 570, page 303.

"The question whether a servant was acting within the scope of his employment at the time of the injury complained of ordinarily is one of fact. The question whether a servant was acting within the scope of his employment at the time of the injury complained of may be a question of fact or of law. Where the evidence is conflicting or more than one inference can be drawn therefrom, it is for the jury to determine, under appropriate instructions from the court, whether the servant was acting within the scope of his employment at the time of the injury complained of." 57 C.J.S., Master and Servant, § 617, page 411.

"The term 'course of employment' implies that the employee whose act is in question was rendering some service for the employer at the time the injury was suffered. But the particular act (in the sense of method of doing the work) need not have been impliedly authorized by the master.

" 'To hold the master liable for the act of his servant, it is not necessary that the servant should have authority to do the particular act \* \* \*. But the act must be done within the scope of the general authority of the servant. It must be done in furtherance of the master's business and for accomplishment of the object for which the servant is employed.' " 29 Tex.Jur. 132.

After most careful consideration of all the testimony relative to whether the brakeman was acting within the scope of his employment, we have concluded that the evidence is sufficient to make it a question for the determination of the jury. See Lowry v. Anderson-Berney Building Company, 139 Tex. 29, 33, 161 S.W.2d 459; Houston & T. C. R. Co. v. Rutherford, 94 Tex. 518, 521, 62 S.W. 1056; Texas Power & Light Co. v. Denson, 125 Tex. 383, 389, 81 S.W.2d 36; Sid Katz, Inc. v. Walsh & Burney, 142 Tex. 232, 237, 177 S.W.2d 49. Points one to five are overruled.

Appellant's fifth point is: "The Court erred in permitting the Plaintiff to prove by Plaintiff's brother, over the objections of the Defendant, what wages were paid carpenters in the vicinity of Avery, Oklahoma, for a period of from seven to ten years prior to the date of the trial, the evidence showing that the Plaintiff was a carpenter

residing in the State of Arkansas, and that he was injured in Ward County, Texas, while on his way to the State of Arizona to procure a job as a carpenter, and there is no evidence that the Plaintiff ever intended to do carpenter work in the State of Oklahoma, and such evidence was inadmissible."

Pete Crown testified that he had been working at Fayetteville, Arkansas, as a carpenter and that at the time he was injured he was going to Tucson, Arizona, where he had a job at Fort Huachuca.

Pete Crown was injured January 8, 1941. The case was tried September 29, 1948. In order that the circumstances surrounding the introduction of the evidence complained of may be clearly shown, we quote the following from the testimony of Wayne Crown:

"Q. Now, you have worked as a carpenter from the time that Pete was hurt up to the present time, have you not? A. Yes, sir.

"Q. And with the skill that Pete had at the time that he was hurt, could he have earned more money during these seven years and a piece than he has earned? Just a minute now.

"Appellant's Counsel: We object, your Honor.

"The Court: Sustain the objection.

"Appellee's Counsel: May I ask what grounds?

"The Court: I think that's for the jury to determine. I think that's a question they will have to pass upon.

"Appellee's Counsel: Note our exception.

"Q. Appellee's Counsel: Now, are you familiar with the wage paid a carpenter during this period of seven years, since Pete's injury?

"Appellant's Counsel: Your Honor, we object to that as being irrelevant and immaterial and not specific as to any particular locality.

"The Court: Sustain the objection, unless you * * *

"Q. Appellee's Counsel: There in the locality where you were?

"Appellant's Counsel: We object to that, your Honor, as being—

"The Court: Overrule the objection.

"Appellant's Counsel: Note our exception.

"A. (Q. Appellees' Counsel: Are you familiar with the wage paid to carpenters there in the area where you were during that ten years and a piece? A. Yes, sir.

"Appellant's Counsel: Your Honor, we object to that because there is no evidence in here that the Plaintiff was going up there to do that kind of work. He was on his way to Arizona and we certainly object to that as being irrelevant and immaterial to any issue in this case and we ask that the answer be stricken and not considered by the jury.

"The Court: Overrule the objection.) B

"Appellant's Counsel: Note our exception.

"Q. Appellee's Counsel: Now, what was the rate of pay as compared to the work that Pete did in the rehabilitation work that he did following the injury?

"Appellant's Counsel: Your Honor we object to that as being improper.

"The Court: I thought you asked the rate of pay for skilled work.

"Appellee's Counsel: Yes, your Honor, I did and if I understood him he is familiar with the wage paid carpenters—

"The Court: Sustain that objection.

"C (Q. Appellee's Counsel: What was the rate of pay that carpenters were drawing during that seven year period of time? A. Well, it varied quite a bit; from about a dollar an hour up until now I get $2.25) D

"Q. And do you know the amount paid to Pete for the type of work that he did following his injury? A. Not exactly, but I think around—

"Appellant's Counsel: We object to what he thinks.

"The Court: Sustain the objection."

 Unless the wage rate paid carpenters was shown to be the same over the United States, evidence was not admissible as to wages paid carpenters in another State where appellee was not likely

to work as a carpenter. 25 C.J.S., Damages, § 87, page 625. Appellant's point asserts Wayne Crown was permitted to testify what wages were paid carpenters around Avery, Oklahoma, over appellant's objection that there was no evidence Pete Crown was going to Avery to do carpenter work but that, on the contrary, Pete Crown was on his way to Arizona. The testimony quoted above (A to B) does not sustain the assertion. Over said objection, Wayne Crown testified only that he knew what wages were paid carpenters around Avery at the time in question. He did not say what the wages were. What the witness knew but did not disclose to the jury could not have injured appellant. As shown by the quotation C to D, said witness was later asked what carpenters were paid from the time Pete Crown was injured to the time of trial. The question was not limited to Avery, or any other area. The answer is susceptible to the interpretation that during said time carpenters were paid $1 an hour "and up," and that the witness then volunteered the statement that at the time of the trial he was receiving $2.25 per hour. Regardless of what the proper interpretation may be, no objection thereto is shown. Even if A to B, admitted over proper objection, had disclosed the same question and answer as C to D, reversible error would not be shown because the same evidence would have been later admitted without objection. The Supreme Court has repeatedly held that a judgment should not be reversed under such circumstances. Slayden v. Palmo, 108 Tex. 413, 416, 194 S.W. 1103, 1104; Pullman Palace Car Co. v. Smith, 79 Tex. 468, 14 S.W. 993, 13 L.R.A. 215, 216, 23 Am.St.Rep. 356; Walker v. Great Atlantic & Pacific Tea Co., 131 Tex. 57, 112 S.W.2d 170, 172; Nance v. McClellan, 126 Tex. 580, 89 S. W.2d 774, 778, 106 A.L.R. 117. See also McElwrath v. Dixon, Tex.Civ.App., 49 S. W.2d 995, 997; Chicago, R. I. & G. R. Co. v. Harris, Tex.Civ.App., 28 S.W.2d 611, 616, writ dis.; Johnson v. Ashby, Tex.Civ.App., 18 S.W.2d 726; Texas & P. R. Co. v. Edwards, Tex.Civ.App., 21 S.W.2d 754, 757; 3 Tex.Jur. 190.

Appellant's sixth point is that the verdict awarding appellee $50,000 is grossly excessive, and not supported by the evidence. We have attempted to examine every comparable case, and conclude, as did Judge Robertson in Gulf C. & S. F. Ry. Co. v. Dorsey, 66 Tex. 148, 153, 18 S.W. 444, 445, that "on this question the volumes provided for our general guidance are dumb counselors."

Decisions by our Supreme Court that deal generally with the test to be made may be found in Gulf C. & S. F. Ry. Co. v. Dorsey, supra; Howard Oil Company v. Davis, 76 Tex. 630, 636, 13 S.W. 665; International & G. N. R. Co. v. Gilbert, 64 Tex. 536, 541 and Missouri Pac. R. Co. v. Lehmberg, 75 Tex. 61, 12 S.W. 838, 840. "The uncertainty surrounding the estimation of the amount which will afford a fair money compensation for a personal injury is reflected by the wide differences in the amounts assessed by juries in similar cases and by the judgments of the appellate courts as to what awards are excessive. * * * Each case, apparently, is made to depend on its own peculiar circumstances. But while the peculiar facts of each case must govern in fixing the amount of damages, and precedents have but little authoritative value, still the judgments of courts in similar cases is at least persuasive and of some assistance in arriving at a proper conclusion." 13 Tex.Jur., 268, 269.

The duty of guarding against excessive verdicts rests first upon a jury, then upon the trial court and eventually upon the appellate court. 5 C.J.S., Appeal and Error, § 1651, pages 646, 649. A verdict should not be set aside as excessive unless it is apparent that the evidence for the appellee is insufficient to support the judgment for the amount for which it was entered. 5 C.J.S., Appeal and Error, § 1651, page 649. See also 25 C.J.S., Damages, § 196, page 910 et seq. and 15 Am. Jur. 640, 641.

In the following authorities may be found many cases in which comparable awards for somewhat similar injuries have been held excessive or not, depending upon the varying circumstances of the cases:

25 C.J.S., Damages, § 198, page 962; 17 C.J. page 1110; 46 A.L.R. 1341; 102

A.L.R. 1386; L.R.A.1915F, 308; 13 Tex. Jur. 302; Aly v. Terminal R. Ass'n of St. Louis, 342 Mo. 1116, 119 S.W.2d 363, 368; Yazoo & M. V. R. Co. v. Wallace, 91 Miss. 492, 45 So. 857, 858; Joice v. Missouri-Kansas-Texas R. Co., 354 Mo. 439, 189 S.W.2d 568, 577, 161 A.L.R. 383.

Some of the pertinent facts have been heretofore stated. Pete Crown was 22 years of age on January 8, 1941 when both legs were cut off below the knees. There was evidence that before his injury Pete Crown was a normal, healthy man of said age. It was agreed that such a person then had a life expectancy of thirty years. One leg was severed four inches below the knee and the other seven and one-half inches below the knee. The trial was had more than seven and one-half years later. At the time of the trial he was walking around on wooden feet and legs which he made.

Appellee testified that after his injury on January 8, 1941, he remained in the hospital at Monahans until the 25th day of February, 1941. In other words, he spent forty-seven days in a hospital. He testified that he had "hobbled around" since the accident but could not do carpenter work. Appellee further testified that on February 25, 1941, he went to Avery, Oklahoma and lived with his brother Wayne, until July 1, 1941; that during that time he did not attempt to do any work; that on July 1, 1941, he went to Oklahoma City and stayed with another brother until November 25, 1941, when he got his first artificial legs; that he then started training under the State rehabilitation program refinishing furniture and building cabinets. He did this kind of work for two or three months but found it was "too much on my feet;" that he was then transferred by the State rehabilitation organization and started making artificial legs in Oklahoma City; that he continued doing this kind of work for three years; that in 1944 he worked for Douglas Aircraft in Oklahoma City. It is not shown what kind of work he did for Douglas Aircraft, nor the pay he received. In 1945, according to his testimony, he left Douglas Aircraft and went to Dallas, Texas where he worked for Mrs. Hedgecock, presumably making arti-

ficial limbs, for a little over two years; that in 1947 he went to Little Rock, Arkansas where he still resides. He has married since the accident and is the father of four children. He testified that he is now engaged in making artificial limbs for W. T. Adams in Little Rock.

Appellee testified that when he started working in Oklahoma City he was paid $12.50 per week; that when he quit working there he was making $30 per week and that he was paid $50 a week in Dallas. He testified that he has become skilled in making artificial limbs; that he has no trouble getting employment of that kind and that he is being paid $1.25 per hour for that kind of work. He testified that carpenters are paid 50¢ to 75¢ per hour more than men are paid for making artificial limbs. Plaintiff testified that before his injury he had been working as a carpenter for his father in Fayetteville, Arkansas, that his father paid him 50¢ per hour and board and room; that he "imagined" he was then making $1,000 to $1,500 per year. He testified:

"Q. Then you are making twice as much money as you made back before this accident, aren't you? A. Yes, sir."

The evidence does not reflect more than the minimum of suffering that would necessarily result from such a serious injury. He spent forty-seven days in a hospital. He returned to work in November after his injury in January of the same year. He is earning twice as much money as he did before his injury. The evidence discloses a serious injury and some loss of earning capacity. Under the verdict, we cannot consider suffering or any other thing that may occur after the trial as affecting the question of excessiveness of the verdict, except subsequent loss of earning capacity, if any. While there is no mathematical formula for determining with exactness what is reasonable compensation for his suffering up to the time of the trial and loss of earning capacity, our Supreme Court has said that proof of his earnings before and after the injury constitute the best evidence of the extent of loss of earning capacity. McIver v. Gloria, 140 Tex. 566, 169 S.W.2d 710, 712. See also El Paso Electric R. Co. v. Murphy, 49 Tex.Civ.App.

586, 109 S.W. 489, writ ref., and South Plains Coaches, Inc. v. Behringer, Tex.Civ. App., 32 S.W.2d 959, writ dis. The verdict and judgment awarded appellee $50,000 for pain and suffering from January 8, 1941 until the trial on September 29, 1948 only, and loss of earning capacity between said dates and loss of earning capacity that he might sustain thereafter. Having made an exhaustive research and realizing that no two injuries are exactly alike or produce precisely the same result, we are constrained to hold that the verdict for $50,000 exceeds a rational appraisal and estimate of the damages shown by appellee. See 15 Am. Jur. 620. We conclude that the judgment is excessive by $12,500.

As being persuasive on this question, we call attention to the following decisions. Henwood v. Moore, Tex.Civ.App., 203 S.W. 2d 973, 976; Gillette Motor Transp. Co. v. Whitfield, Tex.Civ.App., 197 S.W.2d 157, 167, affirmed, 145 Tex. 571, 200 S.W.2d 624; Yazoo & M. V. R. Co. v. Wallace, 91 Miss. 492, 45 So. 857, 858; Aly v. Terminal R. Ass'n of St. Louis, 342 Mo. 1116, 119 S.W.2d 363, 368.

**■** Appellee was a trespasser on appellant's train, but, if appellant's brakeman kicked him off the train, as the jury found he did, the brakeman acted willfully and maliciously and was guilty of gross negligence, as a matter of law. There was evidence from which a jury might conclude that appellee would sustain some loss of earning capacity in the future and the court did not err in permitting the jury to consider possible future loss in earning capacity. Appellant's additional points have been carefully considered, are deemed without merit and are overruled.

**■** If appellee desires to file a remittitur of $12,500 on or before the 26th day of April, 1949, the judgment of the trial court will be so reformed and affirmed and one-fourth of the costs in this court will be taxed against appellee. Otherwise, the judgment will be reversed and the cause remanded. Texas Rules of Civil Procedure, rule 440; Tri-County Electric Cooperative, Inc. v. Clair et al., Tex.Civ.App., 217 S.W.2d 681, 687. All parties may file motions for rehearing within fifteen days after entry of final judgment either affirming on remittitur or reversing the judgment.

Supplemental Opinion.

On April 15, 1949, in accord with a written opinion of said date, it was ordered that the above cause be reversed because of the excessiveness of the verdict awarding to appellee $50,000 unless the appellee should, on or before the 26th day of April, 1949, file a remittitur of $12,500. It was further ordered that if such remittitur should be filed the judgment of the trial court should be affirmed.

Appellee having, on April 19, 1949, filed a remittitur of $12,500, the judgment of the trial court is, thus reformed and, as reformed, affirmed.