Robert C. MOORE, Plaintiff-Respondent,

v.

READY MIXED CONCRETE COMPANY and James Calvin Wohlgemuth, Defendants-Appellants.

No. 47106.

Supreme Court of Missouri,

En Banc.

Nov. 12, 1959.

John G. Madden, James E. Burke, John A. Biersmith, Jr., Kansas City, for appellants, Madden & Burke, Kansas City, of counsel.

David R. Hardy, Lane D. Bauer, Donald K. Hoel, Kansas City, S. Preston Williams, Wm. Harrison Norton, North Kansas City, for respondent, Sebree, Shook, Hardy & Ottman, Kansas City, Williams & Norton, North Kansas City, of counsel.

HOLMAN, Commissioner.

At about 11 a. m. on April 27, 1955, plaintiff received serious personal injuries when the motorcycle he was riding was struck by a concrete truck owned by the corporate defendant and being driven by defendant James Calvin Wohlgemuth. At that time plaintiff was in the performance of his duties as a sergeant with the North Kansas City Police Department, and Wohlgemuth was admittedly operating the truck in furthering the business of his employer, Ready Mixed Concrete Company. In this action for damages plaintiff obtained a nine-juror verdict against both defendants for the sum of $200,000. In accordance with an order of the trial court plaintiff entered a remittitur in the sum of $50,000 and a final judg-

ment was thereafter entered for $150,000. Defendants have appealed.

Defendants' first contention is that plaintiff was guilty of contributory negligence as a matter of law and hence the court erred in overruling their motion for a directed verdict at the close of all the evidence. We will state so much of the evidence relating to the question of liability as would appear necessary for a proper understanding of that issue. The casualty in question occurred at the intersection of Burlington Avenue and 16th Street in North Kansas City, Missouri. Burlington Avenue (also known as U. S. Highways 69 and 169) is a heavily traveled through street. North and southbound traffic is divided by a medial strip 25 feet wide. East of the medial strip are three lanes for northbound traffic, each 11 feet wide, and east of the east lane is a curb lane nine feet and six inches wide which is used for parking. Sixteenth Street is 36 feet wide and runs east and west. On the morning in question cars were parked on each side of that street. At that time traffic at the intersection in question was not controlled by signal lights but there was a stop sign on 16th, 29 feet east of the east curb of Burlington, which controlled westbound traffic entering the intersection. The speed limit on Burlington was 35 miles per hour. The morning in question was described by one of the witnesses as a clear, dry, pleasant spring morning.

Shortly before the casualty two large Kroger tractor-trailer trucks left the warehouse of that company which is located on the northeast corner of the intersection of 15th and Burlington. These trucks turned north on Burlington and were traveling in the east lane for northbound traffic. The driver of the second truck, Harold McGregor, testified that as he proceeded north at a speed of from 10 to 15 miles per hour his rear-vision mirror disclosed a motorcycle approaching from the rear with its red lights flashing. He stated that it was traveling near the right side of the west northbound lane; that the first Kroger truck stopped at 16th Street and was awaiting an opportunity to turn right on 16th; that the van-type trailer on that truck was eight feet wide; that the defendants' concrete truck was traveling west on 16th and stopped at or near the stop sign; that when the second Kroger truck was 125 feet south of the intersection, defendants' truck started forward from its position at the stop sign, and at that moment the motorcycle passed the truck being driven by the witness; that when the front of the concrete truck appeared at the left side of the front Kroger truck, plaintiff's motorcycle was 50 feet from the south curb line of 16th and the defendants' truck had attained a speed of ten miles per hour and did not reduce its speed prior to the collision. The witness stated further that there were no vehicles near the intersection in either the center or west northbound lanes at the time the motorcycle passed him; that the motorcycle was going somewhere between 35 and 40 miles per hour and the collision occurred as the defendants' truck entered the west lane for northbound traffic; that at the time of the collision the plaintiff "literally flew through the air" and landed in the east lane of the highway for southbound traffic; that the truck stopped after proceeding from three to five feet beyond the collision point; that the left front headlight, left fender, and left bumper of the truck came in contact with the motorcycle.

Another witness for plaintiff, Floyd Bloom, stated that on the morning in question he was driving north on Burlington in the center lane; that as he passed 10th Street he saw plaintiff on his motorcycle at the northeast corner of that intersection; that plaintiff turned into Burlington and followed his car with two red lights flashing on the motorcycle; that his car was going from 30 to 33 miles per hour; that plaintiff passed him just as his car had crossed 15th Street, at which time the motorcycle was being operated in the center of the west northbound lane; that when defendants' truck came from behind the first Kroger truck plaintiff was 50 feet from 16th

Street; that the defendants' truck was going between five and ten miles per hour and did not slow down prior to the collision which occurred north of the center of 16th and near the west edge of the west lane for northbound traffic on Burlington; that the motorcycle swerved to the left just prior to the collision and that the left front of the truck struck the right front of the motorcycle. The witness further stated that the truck stopped three or four feet west of the point of impact.

Leslie Brown, a salesman for Graybar Electric, was traveling north on Burlington at the time of the casualty and was in the east lane for northbound traffic, going from 30 to 35 miles per hour. He stated that in the block south of 16th Street, plaintiff's motorcycle passed his car going approximately 30 or 35 miles per hour; "he just passed us gradually; couldn't have been going much more than 35." This witness did not see the actual collision because he was required to stop his car behind the Kroger trucks. On cross-examination he admitted having given a statement wherein he had said that the motorcycle was going from five to ten miles per hour faster than his car. On redirect examination it was brought out that the witness had signed another statement on the day of the casualty in which he stated that plaintiff was going "possibly 35" miles per hour.

Mrs. Phlet Boyd was driving her car south on Burlington in the east lane for southbound traffic and had an unobstructed view of the intersection as she approached 16th Street. She testified that she first saw the motorcycle when it was down by the Kroger warehouse; that the first Kroger truck was parked in the east lane for northbound traffic and she watched the concrete truck come into the intersection from 16th; that she could not estimate the speed of that truck but it did not slow down or stop after it entered the intersection; that just prior to the impact plaintiff tried to swerve the motorcycle to the west but the left front of the truck struck the middle of the motorcycle "between the two wheels"; that after the impact plaintiff's body landed in the east lane for southbound traffic in front of her car, but the witness was able to slow her car and pull it partially off the road so that it did not strike plaintiff.

Plaintiff testified that on the morning of April 27 he was checking traffic at 10th and Burlington; that about 11 a. m. he started north on Burlington and turned east on 14th and at that time heard a radio call concerning a disturbance at Allen's Chevrolet, at which time he turned around and re-entered Burlington and proceeded north; that he had his red lights on but did not sound his siren except briefly at the intersection of 14th and Burlington where the red light was "against me"; that he looked at his speedometer at 15th Street and saw that he was going 35 miles per hour and he did not thereafter increase his speed; that he approached 16th in the west northbound lane and did not turn on his siren because he was on a through street and was aware of the stop sign for westbound traffic entering from 16th Street; that as he approached 16th he looked ahead and both to the right and left and noticed that his vision was somewhat obstructed by the semitrailer in the east lane. The witness further stated that he saw the concrete truck as it came from behind the front of the truck which was stopped in the east lane of the intersection; that at that time the concrete truck was entering the center lane for northbound traffic and the motorcycle was 50 or 60 feet from the intersection; that he saw the truck "just an instant, * * * possibly a second, maybe two," before the collision; that he knew he didn't have time to stop, and tried to swerve toward the west; that he did not know where the collision occurred; that after the collision he became conscious briefly while on the pavement, and again while the ambulance was crossing the ASB Bridge, and thereafter did not know anything for four or five weeks except for the memory of a lot of pain.

On cross-examination plaintiff admitted that in his deposition, taken December 20, 1957, he stated that the truck was "right on top of me" when he first saw it, and in another place that he got a glimpse of it out of the corner of his eye when it was right on him.

Plaintiff also presented the testimony of James R. Newman of the police department of Kansas City, Missouri, who qualified as an expert on stopping distances, etc. He testified that average reaction time was 3/4 of a second; that at 35 miles per hour the motorcycle would travel 38½ feet during reaction time and could be stopped in another 102 feet, or a total stopping distance of 140 feet 6 inches; that at 40 miles per hour, the total stopping distance would be 178 feet; that the concrete truck could have been stopped in 6.7 feet at five miles per hour, or in 15.8 feet at ten miles per hour.

The driver of the Ready Mixed Concrete truck, Mr. Wohlgemuth, testified on behalf of the defendants. He stated that the truck was in good mechanical condition; that on the morning in question he had made a delivery of concrete at a point three blocks east of Burlington on 16th, and at the time of the collision was returning to the plant; that he was driving west on 16th and intended to make a left turn and go south on Burlington. He stated that he stopped before entering Burlington and that the driver of the first Kroger truck motioned for him to come on out so that he could make his turn; that he proceeded out to the edge of the truck where he could see south; that there was a car in the middle lane about 25 feet south of 16th which was slowing so he proceeded on out into the highway; that as he entered the third lane he glanced to the north and then back to the south and at that time first saw the motorcycle. He thought it was going to hit the truck so he put on the brake and traveled about five feet and then stopped. The motorcycle swerved "a small amount" and "he hit the truck on the left front fender and bumper, and he

went into the air and lit in the medial strip, and rolled to the east lane of the southbound traffic." He stated that he had crossed the intersection at somewhere around five miles per hour. It is difficult to determine from his testimony just where plaintiff's motorcycle was when this witness first saw it. For example, on direct examination the witness stated that the motorcycle was 15 feet south of the south side of the medial strip at that time. On cross-examination he admitted giving a statement on the day of the collision in which he stated that the motorcycle was not more than eight feet from his truck when he first saw it. He attempted to explain this by saying he meant eight feet south of the intersection, and finally testified that he did not know which estimate was right. At one point on cross-examination the witness stated that when his truck came out from behind the Kroger truck so that he could see to the south, he stopped and looked southwardly before proceeding further into the intersection, but admitted that in his statement given on the day of the occurrence he stated that he proceeded from the stop sign at a speed of from five to ten miles per hour and never changed his speed until he saw the motorcycle.

■ The case was submitted to the jury upon the primary negligence of defendant Wohlgemuth in failing to keep a careful and vigilant lookout. In determining the question as to whether plaintiff was guilty of contributory negligence as a matter of law "we bear in mind that plaintiff's negligence is a jury question, unless it may be said from all the evidence and the reasonable inferences therefrom, viewed in the light most favorable to plaintiff, the only reasonable conclusion is that plaintiff was negligent and that his negligence was a proximate cause of his injury." Kickham v. Carter, Mo.Sup., 314 S.W.2d 902, 908.

Defendants contend that plaintiff was guilty of contributory negligence, as a matter of law, in four particulars, i. e., (a) failure to keep a lookout, (b) excessive

speed, (c) lack of control over his motorcycle, and (d) failure to yield the right of way. In considering those questions we should bear in mind that plaintiff admittedly was not sounding his siren and does not rely on any exemptions granted to emergency vehicles.

■■ As has been stated, plaintiff testified that as he approached 16th he looked ahead and both to the right and left and saw the concrete truck as it entered the center lane when plaintiff was 50 or 60 feet away, and that he swerved to the west in an effort to avoid a collision. In support of their contention that plaintiff was guilty of contributory negligence as a matter of law in failing to keep a lookout, defendants point to his pretrial deposition testimony to the effect that he first saw the truck "at the instant it hit me," when it was "right on top of me." Plaintiff explained those answers, at least to some extent, when he testified at the trial that he considered an instant to be "a second, maybe two." However, the obvious difficulty with the foregoing contention is that defendants seek to attribute to the deposition testimony the conclusive effect of a judicial admission. That position is not sound. Assuming that the testimony was contradictory, plaintiff was not bound by his deposition and it was for the jury to say which version of the facts was true. Hamilton v. Patton Creamery Co., 359 Mo. 526, 222 S.W.2d 713; Davidson v. St. Louis-San Francisco R. Co., 301 Mo. 79, 256 S.W. 169.

■ The right of the instant vehicles to enter the intersection in question was governed by a city ordinance which reads as follows: "The driver of any vehicle who has stopped as required by law at the entrance to a through street shall yield to the other vehicles within the intersection or approaching so closely on the through street as to constitute an immediate hazard, but said driver having so yielded may proceed and other vehicles approaching the intersection on the through street shall yield

to the vehicles so proceeding into or across the through street." Defendants have made certain mathematical calculations which they say show that plaintiff's motorcycle was a block or two south of the intersection when defendants' truck started forward after stopping at the stop sign and hence they contend that plaintiff was guilty of contributory negligence as a matter of law in failing to yield the right of way to defendants' truck which had rightfully entered the intersection ahead of him. However, Mr. McGregor, an eyewitness, testified that plaintiff was 125 feet from the intersection when defendants' truck started from the stop sign. Under the factual situation presented it would seem to be a jury question as to whether the motorcycle constituted an immediate hazard to the entry of the concrete truck into the through street.

As indicated, it is also the contention of defendants that plaintiff must be said to have been negligent in entering the intersection in question at a speed of at least 35 miles per hour when his view to the right was obstructed by the large Kroger truck which was standing in the east lane of Burlington.

Defendants have cited a large number of cases in support of the various subpoints which, they contend, when considered either individually or in combination, convict plaintiff of contributory negligence as a matter of law. The principal cases they rely upon are: Wilson v. Toliver, 365 Mo. 640, 285 S.W.2d 575; Smith v. Siercks, Mo. Sup., 277 S.W.2d 521; Thaller v. Skinner & Kennedy Co., Mo.App., 307 S.W.2d 734; Pulitzer v. Chapman, 337 Mo. 298, 85 S.W. 2d 400; Cooksey v. Ace Cab Co., Mo.Sup., 289 S.W.2d 40; Frandeka v. St. Louis Public Service Co., Mo.Sup., 234 S.W.2d 540; Dempsey v. Horton, 337 Mo. 379, 84 S.W. 2d 621; Adkins v. Boss, Mo.Sup., 290 S.W. 2d 139; Wyatt v. Hughes, Mo.App., 236 S.W.2d 371; Roberts v. Wilson, 225 Mo. App. 932, 33 S.W.2d 169; Creech v. Blackwell, Mo.Sup., 298 S.W.2d 394; Lilly v. Boswell, 362 Mo. 444, 242 S.W.2d 73; Rob-

erts v. Consolidated Paving & Materials Co., 335 Mo. 6, 70 S.W.2d 543; Douglas v. Whitledge, Mo.App., 302 S.W.2d 294; State ex rel. Kansas City Southern Ry. Co. v. Shain, 340 Mo. 1195, 105 S.W.2d 915. We have read and carefully considered those cases but space will not permit a detailed analysis of them. It would seem to be sufficient to say that each of those cases is factually different in one or more important respects from the situation presented in the instant case and therefore they may not be considered decisive authorities.

■ Considering the evidence most favorable to plaintiff we observe that plaintiff approached the intersection at a speed of not more than 35 miles per hour with his red lights flashing, he was cognizant of the fact that he was traveling on a through street, and he knew that there was a stop sign which controlled westbound traffic on 16th. While there was an obstruction of his vision to the east, it should be noted that plaintiff was traveling in the west lane for northbound traffic which would tend to give him the maximum vision possible under the circumstances. Plaintiff looked to the east and west as well as ahead. We also have the view that plaintiff could reasonably infer that drivers of westbound vehicles on 16th would be cautious in entering a through street when the large truck obscured their view as to vehicles approaching the intersection from the south. Under all the circumstances we rule that the question of plaintiff's contributory negligence was properly left to the jury. Our decision is supported by the recent case of Kickham v. Carter, supra, which involved a rather similar situation. See also Collier v. St. Louis Public Service Co., Mo. App., 298 S.W.2d 455.

A more serious question arises in connection with contentions of error in regard to questions propounded to the jury panel by plaintiff's counsel upon the voir dire examination. That complaint is based upon the following: "Mr. Hardy: Now, in this case I state that the amount sued for is $300,000. Naturally, this jury will be the final judge of the amount, if any, of the damages to which Mr. Moore is entitled, but in filing this case the figure of $300,000 was not just picked out of the air. We intend·to prove damages amounting to more than that * * *. Is there anyone on the panel that if the plaintiff's evidence shows you that Bob Moore has been ruined for life, and that he has been damaged at least $300,000, and under the court's instructions as to the law you feel he is entitled to recover, is there anyone who would have any hesitancy for any reason in bringing in a verdict of $300,000 for him, if the evidence shows he is entitled to it? Mr. Howard L. McIntosh: I am afraid I would." Without any specific challenge being made the court excused Mr. McIntosh. Mrs. Robinson (of the jury panel) then asked that the question be repeated. At that point counsel for defendants (out of the hearing of the jury) moved that the panel be discharged upon the ground that the question imposed upon the panel a commitment of a willingness to return a verdict for $300,000. The motion was overruled.

Thereafter, the following occurred: "Mr. Hardy: My last question was that in view of the fact that the plaintiff is here seeking damages in the amount of $300,000, if we prove damages to Mr. Moore of $300,000 or more, and if under the court's instructions concerning the law it is shown that we are entitled to recover, would you have any hesitancy in bringing back a verdict that large? Mrs. Robinson: I believe so; being a business woman; yes." The court then excused Mrs. Robinson. Defendants objected to the discharge of the juror and renewed the motion to discharge the panel. The objection and motion were overruled. Two additional members of the panel were thereafter separately examined and the following question was asked of them: "Mr. Hardy: At the time that you came in, the first thing that was asked was in regard to whether or not any member of the panel would have any hesitancy in bringing in a

verdict in the amount sued for. You considered that was applicable to you, did you not? You didn't answer, so I take it that you considered it applicable to you * *."

Defendants contend that the foregoing voir dire examination constituted error because the questions sought to commit the members of the panel to return a verdict for $300,000 if they found that plaintiff was entitled to recover and to do so if *plaintiff's evidence* proved damages in that amount (rather than referring to all the evidence), and to return a verdict in that amount without "any hesitancy." Among the cases cited is the case of Pence v. Kansas City Laundry Service Co., 332 Mo. 930, 59 S.W.2d 633, wherein plaintiff's counsel asked the members of the panel whether they had in mind any fixed amount beyond which they would not render a verdict. Upon appeal we held that no proper objection had been made to the inquiry, but observed in a statement of dictum that the examination was "in a manner not to be approved."

We have concluded that we need not actually decide the question as to whether the examination under review was or was not error or whether the rulings of the court in that connection constituted an abuse of the discretion of the trial court in controlling the voir dire examination of the panel. This for the reason that even if such be assumed to be error we have the view that it was not prejudicial, under the circumstances here presented. We will therefore assume, for the purposes of this opinion, that the examination in question was erroneous. However, as indicated, for reasons hereinafter appearing, we rule that such would not constitute reversible error. In the first place it is obvious that the jurors did not understand that they were committed to return a verdict for $300,000 because they did not do so. Furthermore, the (assumed) error in phrasing the questions in a manner that referred only to plaintiff's proof of damages did not result in prejudice to defend-

ants because it later developed that defendants did not offer any evidence upon that issue and hence plaintiff's evidence on the question of damages was all that was before the jury. Moreover, at the request of defendants, the court gave Instruction No. 20 which reads, in part, as follows: "Damages, like liability, must be determined by you solely under the evidence and under the instructions of the court. You are not obligated or committed by any questions of counsel or rulings of the court on your preliminary examination as jurors to return any particular amount in the event you find for the plaintiff. You will therefore disregard any statements of counsel or rulings of the court on your preliminary examination which you might deem contrary to the law as given you in this instruction." We must assume that the jury read and followed that instruction. It clearly told the jurors that they were not committed by the examination under review to return a verdict in any particular amount, and directed them to disregard any statements or rulings that they might deem contrary to that mandate. That instruction should have cured any prejudicial effect that may have resulted from the examination.

In their answer defendants averred that plaintiff was negligent in a number of respects therein specified and that such acts of negligence caused or contributed to cause his injuries. Some of those allegations of negligence were supported by the evidence. Plaintiff's verdict-directing instruction (No. 1) failed to negative his contributory negligence. Defendants contend that said instruction is reversibly erroneous because, as stated, it ignored the defense of contributory negligence. However, at the request of defendants, the court gave Instructions Nos. 11, 12 and 16 which submitted the defense of plaintiff's contributory negligence in three respects hypothesized therein.

It has long been the rule in this state that the failure of plaintiff's verdict-directing instruction (submitting primary

negligence) to negative contributory negligence (supported by pleadings and proof) will constitute reversible error. Daniel v. Pryor, Mo.Sup., 227 S.W. 102; Pence v. Kansas City Laundry Service, supra. However, since 1888, it has been the established rule that the error in failing to include a finding as to contributory negligence in plaintiff's verdict-directing instruction is cured by the submission of that issue in instructions offered by the defendant. Owens v. Kansas City, St. J. & C. B. R. Co., 95 Mo. 169, 8 S.W. 350. That rule has been stated as follows: "* * * a verdict-directing instruction given in behalf of plaintiff which omits therefrom a finding upon a pleaded issue of plaintiff's contributory negligence, supported by substantial evidence, is prejudicially erroneous unless such error is cured by the defendant's submitting that issue in its own behalf." Bowyer v. Te-Co, Inc., Mo.Sup., 310 S.W.2d 892, 897.

In the case of Shepard v. Harris, Mo., 329 S.W.2d 1, 7, in an opinion adopted concurrently herewith, we had occasion to re-examine the rule just stated with the result as indicated by the following quotation from that opinion: "The rhyme or reason for the existence of the present rule is not apparent to us, nor have we found a logical explanation for it. When, upon re-examination, it appears that a reason for a rule does not exist, the rule itself should no longer obtain. We are of the opinion and therefore hold that when a defendant fails to submit the affirmative defense of contributory negligence he has thereby abandoned that defense and it no longer remains an issue in the case for any purpose, and, consequently, a plaintiff's verdict-directing instruction which ignores such abandoned issue of contributory negligence is not erroneous."

In the Shepard case defendant did not submit contributory negligence (although pleaded and supported by proof) and the verdict-directing instruction of plaintiffs did not negative such. It is therefore apparent that the issue before us in the instant case was not involved in that case. However it would logically follow from our holding in Shepard that, also contrary to the present rule, a plaintiff should negative his contributory negligence in the event defendant does submit his pleaded and supported affirmative defense of contributory negligence. When a plaintiff's contributory negligence is and remains a live issue for the consideration of the jury, his verdict-directing instruction should not ignore that issue. When plaintiff's verdict-directing instruction fails to refer to the defense of contributory negligence, and such defense is submitted in an instruction offered by the defendant, the result is a definite conflict between the two instructions. Plaintiff's instruction in that situation purports to embrace all of the facts necessary to a finding for plaintiff and directs a verdict for plaintiff upon a finding of those facts without any reference to contributory negligence or to another instruction submitting that issue. Such an instruction appears to be a complete guide as to the requirements for a plaintiff's verdict and yet it in no manner refers to the issue of plaintiff's contributory negligence, which, according to defendants' instruction, if found affirmatively, would bar a recovery by plaintiff. The two instructions are not harmonious or consistent. Which will the jury follow? If the jury find the facts hypothesized in plaintiff's instruction it may consider that it need not give further consideration to other instructions dealing with the issue of liability. On the other hand, if, as it should, the jury carefully considers and attempts to reconcile all of the instructions, it will likely be perplexed and confused as to the proper manner to interpret and attempt to follow the inconsistent directions contained in the two conflicting instructions. The views herein expressed are similar to those appearing in the majority opinion in Sullivan v. Hannibal & St. Joseph Ry. Co., 88 Mo. 169, which case was overruled in Owens v. Kansas City, St. J. & C. B. R. Co., supra. We think the Sullivan case was sound and should not have been overruled. See also

Guiley v. Lowe, Mo.Sup., 314 S.W.2d 232 [1], wherein this court noted that the present rule has been criticized as illogical and as permitting a conflict in instructions.

■ We therefore hold that in cases where the court gives a defendant's instruction submitting his affirmative defense of contributory negligence, it is error to give a verdict-directing instruction for plaintiff which fails to refer to or negative his contributory negligence. Cases to the contrary should no longer be followed. Since the view we have expressed relates to a rule which deals with procedural rather than substantive law, we think our ruling herein should be applied prospectively and hence should have no application to the instant case or to any other case submitted in the trial court prior to the publication of this opinion in the advance sheet of the Southwestern Reporter. Koebel v. Tieman Coal & Material Co., 337 Mo. 561, 85 S.W.2d 519 [3], [4]; State ex rel. May Department Stores Co. v. Haid, 327 Mo. 567, 38 S.W.2d 44 [10]; Barker v. St. Louis County, 340 Mo. 986, 104 S.W.2d 371; Dell'Aria v. Bonfa, Mo.Sup., 307 S.W.2d 479 [1]; Dempsey v. Thompson, 363 Mo. 339, 251 S.W.2d 42 [4].

■ In view of the prospective application of the aforementioned ruling we do not reach the question as to whether the omission in Instruction No. 1 was reversible error. However, we think the question as to whether the error in failing to refer to the defense of contributory negligence would require a reversal will be determined by the circumstances existing in the particular case and a consideration of all the instructions given therein. For example, we note that in the case at bar the court gave the following instruction at the request of defendant: "The court instructs the jury that if you believe and find from the evidence that both plaintiff and defendants were guilty of negligence as defined in other instructions, and that plaintiff's negligence (if any) directly contributed to the collision in question and to plaintiff's injuries, then plaintiff cannot recover and your verdict will be in favor of defendants." While we need not and do not rule the question, we observe that an instruction of that nature might be a sufficient basis for a ruling that the error would not be considered reversible.

Defendants also say that Instruction No. 1 assumes that Wohlgemuth was under an immediate duty to stop or slacken the speed of the truck at the first moment he could have seen plaintiff, irrespective of whether there was any apparent danger of a collision, and they here contend that the instruction is erroneous in not requiring a finding to that effect. That instruction hypothesized "that as defendants operated said cement truck in a westerly direction on 16th Street across Burlington Avenue, defendant Wohlgemuth negligently failed to keep a careful and vigilant lookout to his left or to the south for northbound vehicles on Burlington Avenue approaching the intersection of Burlington and 16th Street, including plaintiff's motorcycle, if so, and if you further find that had defendant Wohlgemuth kept a careful and vigilant lookout to his left or south as he proceeded across Burlington Avenue, he should have seen plaintiff approaching said intersection in time thereafter for defendant Wohlgemuth to have stopped or slowed said concrete truck and have avoided the collision between the truck and motorcycle, if so, and that defendants thereby failed to exercise the highest degree of care, if so, and if you further find that such failure to exercise the highest degree of care, if so, directly caused the collision * * *."

In support of the foregoing contention defendants rely upon Stakelback v. Neff, Mo.App., 13 S.W.2d 575, and other similar cases, including Nydegger v. Mason, Mo. Sup., 315 S.W.2d 816; Rosenkoetter v. Fleer, Mo.Sup., 155 S.W.2d 157; Greenwood v. Bridgeways, Inc., Mo.App., 243 S. W.2d 111; and Burke v. Renick, Mo.App., 249 S.W.2d 513. The Stakelback case involved an intersectional collision of motor vehicles. The instruction in that case was

held erroneous because the defendant was "incorrectly charged with the duty of stopping, slackening the speed of, or swerving, his automobile, upon the mere appearance of the other car, whether the facts and circumstances were such as to give him reason to believe that a collision was imminent, or not. * * * Even though it is true that this instruction counts upon primary negligence, and not the humanitarian doctrine, there was nevertheless no duty upon defendant to take any of the precautions hypothesized therein, unless there was apparent danger of a collision, which basic fact the jury was not required to find." 13 S.W.2d 577.

The instant instruction is what is sometimes referred to as a "lookout" instruction. In that type of submission it is generally considered sufficient to hypothesize failure to keep a lookout and require a finding that such failure was negligence and directly caused the collision. A number of cases have held that it is not essential for such an instruction to hypothesize the "exact manner in which, and the means by which, he could have acted to have avoided the collision * * * so long as there was substantial evidence to support a reasonable finding that Boss had the means and ability to have so acted that a collision with Riss would have been avoided." Creech v. Riss & Co., Mo.Sup., 285 S.W.2d 554, 562. See also Nelson v. Evans, 338 Mo. 991, 93 S.W.2d 691, Horrell v. St. Louis Public Service Co., Mo.Sup., 277 S.W.2d 612, and Witt v. Peterson, Mo.Sup., 310 S.W.2d 857. As we understand the briefs, defendants concede that plaintiff was not required to hypothesize the manner in which defendants could have acted in avoiding the collision but contend that since he elected to specify failure to slow or stop the truck in avoiding the collision, he should have included a finding that there was an apparent danger of collision. In their reply brief defendants state that "counsel for plaintiff were not content with a simple issue of a negligent failure to keep

a lookout. They injected the issue of negligence in failing to stop or slow the truck." We do not so construe the instruction. We have concluded that failure to "keep a careful and vigilant lookout" is the only negligence submitted and that the instruction was not erroneous in the respects specified by defendants.

If the instruction had omitted the words "stopped or slowed said concrete truck and have," the portion under consideration would have read, "in time thereafter for defendant Wohlgemuth to have avoided the collision." In that event the instruction would admittedly have been proper, and the jury could have found any means supported by the evidence by which the driver of the truck could have avoided the collision. But plaintiff saw fit to restrict the jury to two means (stopping or slowing), both of which were supported by the evidence. In so doing plaintiff did not inject additional elements of negligence into the submission but merely restricted the jury in its determination of the question as to whether the driver of the truck (if he had kept a careful lookout) could have avoided the collision. Such was not prejudicial to defendants but, if anything, was beneficial to them. The nature of the instant (lookout) submission is such that plaintiff was not required to insert in the instruction the aforementioned finding which defendants contend should have been included therein. The factual situation here presented and the nature of the submission under review make the cases cited by defendants inapplicable.

There is no merit in the contention of defendants that the court erred in refusing Instructions Nos. 14 and 15. Those instructions told the jury that when the concrete truck entered the intersection there is no evidence that the motorcycle was approaching on Burlington so closely as to constitute an immediate hazard and that defendants' truck had the right of way in crossing the intersection. Defendants apparently base this contention on cer-

tain mathematical calculations concerning the speed of the vehicles which they say prove that the motorcycle was one or two blocks away when the truck started forward from the stop sign. However, it will be remembered that there was eyewitness testimony that the motorcycle was traveling at 35 miles per hour and was 125 feet from the intersection at the time the truck started forward. The jury could reasonably have found from the evidence that the motorcycle did constitute an immediate hazard and hence that the truck did not have the right of way as it proceeded across the intersection. The instructions were properly refused.

It is next contended by defendants that the court erred in permitting plaintiff to inject into the case the claimed loss of earnings of plaintiff's wife under the guise of the value of nursing services. In his opening statement plaintiff's counsel stated: " * * * the evidence will be that he has from now on the rest of his life—must have nursing care, the type of nursing care that his wife has been giving him since his return home. From the day of his accident, April 27, 1955, to this day, his wife has not been employed. She was working at General Electric at $280 a month, and she quit immediately to devote her entire time and attention to him. The evidence will be that it will take $300 a month—" At that point there was an objection and motion to discharge the jury by defendants' counsel (out of the hearing of the jury) on the ground that what plaintiff's wife earned was immaterial and that the nursing services she rendered were presumed to be gratuitous. Thereafter, near the end of an ensuing colloquy, plaintiff's counsel stated, "this man is entitled to the reasonable value of nursing care, which we will show as being over $300 a month." The court then directed counsel to "put it that way." The opening statement was resumed and the following occurred:

"Mr. Hardy: The evidence will be that Sergeant Moore requires constant nursing care and attention; that the reasonable value of such services are in excess of $300 a month, and he will need that the rest of his life. The evidence will be that that service is being provided for him by his wife, around the clock, who was formerly earning $280 per month at the General Electric Company. (Whereupon the following proceedings were had in the presence but out of the hearing of the jury.)

"Mr. Burke: If the court please, once again I move to discharge the jury, because counsel has—in the face of the admonition of the court, repeated the same improper matter.

"Mr. Hardy: Let the record show that I didn't understand I had any admonition from the court to do anything but clarify it.

"The Court: What I intended to say was that you refrain from further comment about what his wife earned, and simply say that nursing attention would cost that much money, the figure that you indicated, but I didn't want you to continue to refer to the wife's—

"Mr. Hardy: I was just trying to clarify it.

"Mr. Burke: If the court please, I don't think counsel for the defendant in this case ought to be put in the position of having his rights prejudiced by having to object to matters even after the court has ruled.

"The Court: Well, it was a misunderstanding; I am sure he didn't understand what I had to say, but I will take care of the problem, if there is a problem, by instructions. Overruled."

Plaintiff proved by Dr. Dwyer (without objection) that he would need nursing services the rest of his life and that a reasonable charge for same was $250 a month, plus room and board. Mrs. Moore testified that at the time of plaintiff's injury she was employed by General Electric, but the court sustained an objection to the question as to the amount of her salary. She fur-

ther testified that she had not been employed since the date of the casualty but had been in the home and was caring for her husband. In that connection note the following: "Q. Has he required and does he require now very much care and attention? A. Yes, sir. Q. And who gives that to him? A. I do. Q. You don't expect any money for that, do you? A. No, sir." It is also significant that plaintiff's counsel (without objection) made the following statement in his argument to the jury: "Now, you heard Dr. Dwyer tell you that he will have to have this nursing care that his wife is now rendering for him, that he will have to have that the rest of his life. It is not costing him anything directly now; his wife is doing it. But I say that this jury should take into consideration the fact that he is going to have to have it the rest of his life, and there is no assurance that his wife will always be able to do it, so you put that in. The doctor said $250 a month, plus room and board, is the going rate. All right, let's be conservative. Let's say $250 a month, $102,807."

We are unable to see wherein any prejudicial error resulted from the aforementioned proceedings. While the wife's salary was mentioned in the opening statement it is clear from the entire record that plaintiff was not contending that he was entitled to recover for her loss of salary or for her nursing services. (While at one point in the opening statement, plaintiff's attorney, without objection, referred to a sum of $8,680 as the reasonable value of nursing care provided by plaintiff's wife, it is obvious that any contention that he could recover that sum was thereafter abandoned.) The mere mention of her salary in the opening statement would not constitute reversible error. It was made clear in the testimony and in the argument that no claim was being made for the value of her nursing services. The claim for the cost of future nursing services in the argument was expressly based upon the contingency that plaintiff's wife might not "always be able to do it." If there was any-

thing improper in that argument defendants should have objected. We can see no basis for invoking the "plain error" rule (S.Ct. Rule 3.27, 42 V.A.M.S.) as suggested by defendants in the last sentence of their argument on this point.

Plaintiff was 34 years old at trial time. Over the objection of defendants plaintiff was permitted to prove by the mortality tables that the normal life expectancy of a man 34 years old is 34.29 years. Defendants contend that it was error to admit evidence as to a normal life expectancy when plaintiff's evidence showed that his life expectancy had been shortened by the injuries received in the instant casualty. While plaintiff was shown to have been in good health prior to his injury, it is true that Dr. Overesch testified that as a result of the injuries he did not think plaintiff would live to "a ripe old age," and Dr. Dwyer expressed the opinion that as a result of the trauma plaintiff "is going to have a much shorter life than he would have normally expected."

It is generally recognized in this state and elsewhere that, "In actions to recover damages for a permanent injury, resulting in the impairment or partial destruction of the earning capacity of the person injured, and in actions to recover damages for negligently causing death, mortality tables are customarily admitted to show the probable duration of the life of the injured plaintiff or the deceased as the case may be, which is an element in estimating damages." 20 Am.Jur., Evidence, § 971, p. 821. And more specifically in point in the same volume it is said that "it is generally not essential to the admissibility of mortality tables to show that the person whose expectancy of life is under consideration conforms to the standards of health and vigor adopted in compiling such tables. In most jurisdictions, standard mortality tables are admissible in evidence notwithstanding the person whose life expectancy is the subject of inquiry is in poor health, afflicted with disease, or addicted to dissi-

pated habits. * * * As has been suggested, mortality tables are only guides or suggestions to the matters they set out, and cannot be rejected because of sharp variances in the hazards of life among various persons. Such matters are generally considered as going to the probative effect of the evidence, and not to its admissibility. The authorities are in general agreement that the probative value of the mortality tables may be weakened, and even, perhaps, in some cases, destroyed by evidence of ill-health or disease of the person whose life expectancy is in issue; such matters may properly be considered by the jury in weighing the testimony, but they do not render it incompetent." § 975, p. 824. And in Davis v. Springfield Hospital, Mo.App., 196 S.W. 104, 108, the following appears: "It was not error to admit mortality tables to prove the life expectancy. Such tables aid the jury in making an estimate, and are never held to be absolute guides of the judgment and conscience of the jury; they form merely one bit of evidence, along with the proven physical condition of the person to whom they are applied, and are proper and admissible in such cases."

The only Missouri case cited by defendant, Midwest Nat. Bank & Trust Co. v. Davis, 288 Mo. 563, 233 S.W. 406, is not in point. That case did not deal with the admissibility of the mortality tables but with the weight to be afforded the evidence in connection with reviewing the question of excessiveness of the verdict in view of the hazardous occupation of the deceased. We will not extend this opinion by a discussion of the cases cited from other states as they are all distinguishable and not persuasive.

We rule that the court properly admitted the mortality table in evidence. Moreover, we observe that the jury should have fully understood its duty in determining plaintiff's life expectancy since the court, at the request of defendants, gave the following instruction: "The court instructs the jury that any mortality table which has been introduced in evidence here is not to be considered by you as in any way conclu-

sive upon your determination of the life expectancy of the plaintiff, but that you must also take into consideration all the other evidence relating to the health and physical condition of the plaintiff."

The remaining points briefed relate to the alleged excessiveness of the verdict. We will therefore attempt to state the evidence adduced on the question of damages. Plaintiff was 31 years old at the time of the casualty and 34 years of age at trial time. After completing two years of college and a period of service in the Air Corps he came to Kansas City. He worked as a laborer for one year and then became a bookkeeper and teller in the Bank of North Kansas City at a salary of $200 per month. About a year later he became assistant office manager for the North Kansas City Water Company at $250 per month. After three years in that position he started with the North Kansas City Police Department as a patrolman. About a year before his injury he was promoted to sergeant at a salary of $361 per month. At the time of his injury he was in charge of the traffic division and was in direct line for promotion to the classification of lieutenant. At the time of trial the salary of a sergeant was $381 and a lieutenant $405 per month. Plaintiff was married and had one child at the time he was injured. Another child was born six months after the casualty. Plaintiff was in excellent health and active in church and civic affairs.

When admitted to the hospital plaintiff was in a state of extreme shock. He had been severely injured and his condition was quite critical. He was given seven pints of blood and two units of plasma within a few hours after admission to the hospital. As soon as his blood pressure was restored to a reasonably safe level his badly mangled right leg was amputated at the knee and certain other emergency surgical work was done.

The examinations during the first few days of plaintiff's hospitalization disclosed that he had sustained a fracture of the right

ilium (hipbone), a comminuted fracture of the neck of the right femur, a compound fracture of the shaft of the right femur with a deep laceration of the right thigh extending from the groin to the knee—the wound being highly contaminated with dirt, a fracture of the condyle of the right femur where the femur attaches to the tibia, fractures of the superior and inferior pubis rami of the pelvis on both the right and left side, a comminuted fracture of the lower third of the shaft of the left femur extending down into the knee, concussion and severe injury to the brain tissue.

Many difficulties were encountered in connection with the treatment of plaintiff. He had been given large amounts of cortisone which perhaps kept him alive but it had the drawback of delaying the healing process and causing reduced resistance to infection. He developed osteomyelitis, an infectious process of the bones which caused a rotting away in various areas. Infection kept the wounds from healing for a long period. A total of 21 operations under a general anesthetic were performed. Plaintiff suffered severe pain and was given quantities of narcotics over a period of months until he became an addict but the physicians were able to cure him of that addiction before he left the hospital. He developed extensive bed sores which were very difficult to heal. In the fall of 1955 plaintiff became extremely depressed for a period of time.

The medical testimony indicated that other corrective surgery should have been done but plaintiff was not in condition to withstand such procedures. Dr. Overesch was of the opinion that it would have been better to have amputated plaintiff's left leg but the only place it could have been done was at the hip and that is a very unsatisfactory joint for fitting an artificial limb.

In June 1956 a cast was applied from the waist down, covering both legs. It was not removed until the spring of 1957. In July 1956, plaintiff was discharged from the hospital but remained in bed at home for several months thereafter. Since November 1956 he has been able to move around a portion of his home in a motorized wheel chair. Since removal of the cast he has returned to the hospital twice a week for physical therapy treatments. He had obtained an artificial limb for his right leg but was not able to walk on it.

At time of trial (almost three years after his injury), the testimony indicated that plaintiff's condition was as follows: pus still drained from both legs; the total motion of the right hip joint was 35 degrees as compared to a normal of 140 degrees; his left hip joint was frozen and he had no motion therein; his left leg was stiff, with his knee flexing 15 degrees whereas 135 degrees is normal; the left foot pointed down 10 degrees; he had a permanent condition of traumatic osteomyelitis; there was very little, if any, union of the fracture in the right femur which provides a poor supporting structure for an artificial limb; he suffers phantom pains which seem to be in the amputated portion of the right leg.

Plaintiff cannot be given any narcotics in the future without danger of immediate addiction. He is not able to get in and out of his wheel chair without assistance; he cannot use ordinary toilet facilities but must use a bedpan and requires assistance in so doing; he can feed himself and bathe the upper part of his body; as previously indicated, Dr. Dwyer stated he would need nursing service the rest of his life; he has suffered a personality change which tends to make him less fit for any type of work. There is testimony to the effect that plaintiff suffers pain constantly.

Dr. Harry B. Overesch stated that he did not think plaintiff would ever be able to get around effectively on crutches, or otherwise. In regard to disability he testified as follows: "Q. All right, would you tell the jury what your opinion is as to Mr. Moore's condition, in terms of disability? A. This patient's capacity for work is definitely restricted; I would say that he is permanently and totally disabled." Upon cross-examina-

tion this witness stated that plaintiff has developed some standing balance with his artificial limb and has improved in his ability to use his upper extremities; that he is mentally alert and capable of "doing certain types of work that do not involve walking."

Dr. Charles E. Vilmar stated: "I consider this man to be permanently and totally disabled, from a physical standpoint." On cross-examination he expressed the opinion that plaintiff was mentally alert and could do clerical or similar work which did not involve use of his limbs.

On the question of plaintiff's disability, Dr. R. D. Dwyer testified as follows: "Now, do you have an opinion as to the nature and extent of his disability as a result of this accident and the duration of it? A. I would say that he was complete and total disability for the rest of his life."

Plaintiff lives in the small town of Gladstone, Missouri, and is a friend of the police chief of that town. In October 1957, the chief employed plaintiff temporarily as a part-time dispatcher. A transmitter and telephone were installed in the living room of plaintiff's home so that he could do the work in his wheel chair at home. He was paid one dollar per hour and had earned $480 by December 20, 1957.

It was stipulated that the medical and hospital expenses of plaintiff to March 1, 1958, totaled $19,820.86. Computed at $361.-60 per month (although $405 might be warranted) his loss of earnings at trial time was $12,656. Dr. Dwyer testified that plaintiff would need medical care the rest of his life.

■ Defendants contend that "the verdict was so grossly excessive as to show conclusively that it resulted from bias and prejudice on the part of the jury so that the action of the trial court in overruling defendants' motion for a new trial on such ground constituted an abuse of discretion which could not have been cured by remittitur." That point is without merit.

We find nothing in the transcript to indicate that the verdict resulted from the bias and prejudice of the jury against the defendants. In the only case cited by defendants on this point the trial court granted a new trial because of the passion and prejudice of the jury against the defendant. See Jones v. Pennsylvania R. Co., 353 Mo. 163, 182 S.W.2d 157. In recently considering a similar contention we stated: "Appellants have cited no case where this court has not affirmed the action of the trial court, where the trial court has overruled such an assignment. The reason is that, while trial courts may infer bias and prejudice from the size of the verdict alone since they weigh the evidence, appellate courts, as a matter of policy, ordinarily will not do so but will only determine whether the record shows an abuse of the trial court's discretion in sustaining or overruling the motion for a new trial." Myers v. Karchmer, Mo.Sup., 313 S.W.2d 697, 710. We rule that the trial court in the case before us did not abuse its discretion in refusing to grant a new trial because of the alleged bias and prejudice of the jury in the respect indicated.

The final contention of defendants is that the verdict of the jury was grossly excessive and, even after remittitur, is still excessive.

There can be no question but that plaintiff suffered severe, extensive, painful and disabling injuries. "Money cannot effect the restoration of the plaintiff's physical well being. None would exchange a sound physical condition for any sum of money. All courts hold the recovery is measured by that which is 'fair and reasonable compensation.' Money can only provide for a livelihood, and for care and comforts to ameliorate his suffering. There is no mathematical formula by which the amount of compensation in a case of serious and permanent injury can be accurately determined. Fair and reasonable compensation in each case must rest upon the foundation of the facts of the case. Yet some consideration must be given to the amounts

of award which have been held to be fair and reasonable compensation where plaintiffs have suffered similar injuries. There should be reasonable uniformity as to the amounts of verdicts." Jones v. Pennsylvania R. Co., supra, 182 S.W.2d loc. cit. 161.

The cases previously decided should be of some assistance in determining the question presented, although we recognize that no two cases are exactly alike. The largest personal injury judgment we have heretofore approved is $100,000 (reduced by remittitur in the trial court from $150,000) which was in the case of Myers v. Karchmer, supra, decided in 1958. However, the injuries and results in the Myers case were so different from those in the instant case that we do not find it to be of much assistance here. The case most nearly comparable is Counts v. Thompson, 359 Mo. 485, 222 S.W.2d 487, decided in 1949. The injuries to instant plaintiff were comparable in seriousness and resulting disability to those sustained by the plaintiff in the Counts case. In that case the verdict of $165,000 was ordered reduced by remittitur in the trial court to $140,000. Upon appeal we held that it was still excessive and it was reduced by remittitur to $80,000.

There are a number of reasons, however, why a judgment should be approved for a much larger sum in the instant case than was approved in the Counts case. In the first place there were medical expenses in the case at bar totaling almost $20,000, whereas none appeared to have been expended (except for an occasional attendant) by the plaintiff in the Counts case. Moreover, the instant plaintiff was two years younger than Counts and was earning substantially more than he was (at trial time plaintiff's lost wages amounted to $12,656). In comparing this case with the Counts case perhaps the most significant factor to consider is the great decline in the purchasing power of the dollar in the ten years that have passed since the Counts case was decided. When all of the fore-going factors and distinctions are considered we do not believe that the instant judgment of $150,000 is "out of line" in comparison with the $80,000 judgment approved in the Counts case.

We are not impressed with the argument that plaintiff may reasonably be expected to earn money in the future as a clerk or in similar employment. He is capable of doing that sort of work but the difficulty is that it would likely have to be done at the office of his employer and plaintiff could not work away from home without having an attendant available. Someone would have to transport him to and from the place of work, help him in getting in and out of chairs and assist him in using the bedpan and attending to other personal needs. After plaintiff had paid an attendant he would probably not have sufficient net profit remaining to make the effort worthwhile. It may be that he will be able to find something he can do at home which will be profitable but such an eventuality is too speculative, upon this record, for us to seriously consider.

Two cases cited by the defendants are somewhat comparable, from the standpoint of injuries, to the case at bar. In Aly v. Terminal R. Ass'n of St. Louis, 342 Mo. 1116, 119 S.W.2d 363, decided in 1938, a verdict of $85,000 to a 42-year-old plaintiff who earned about $2,500 per year was ordered reduced by remittitur to $40,000. In Joice v. Missouri-Kansas-Texas R. Co., 354 Mo. 439, 189 S.W.2d 568, decided in 1945, a 47-year-old plaintiff who earned about $2,000 a year obtained a verdict for $65,000 which was ordered reduced by this court to $50,000. We do not find those cases persuasive. This primarily because they were both decided before there had been any sharp decrease in the purchasing power of the dollar. Moreover, they also involve plaintiffs who were considerably older and earning a great deal less than the instant plaintiff.

Plaintiff was in the hospital 15 months—in bed several months thereafter and has

been in a wheel chair since. There is no need to restate the evidence concerning his examination, treatment and final prognosis. Plaintiff has undoubtedly suffered intense and perhaps almost continuous pain. As an indication of the difficulty encountered in healing plaintiff's wounds and the unhealthy condition of his tissues, the evidence discloses that after his discharge from the hospital plaintiff still had an open wound in his left leg which was dressed periodically through a window in the cast. He awakened one morning with a distressing sensation in the area of that wound and Dr. Dwyer was called. Upon examination the doctor discovered that the wound was full of maggots, and plaintiff was "tearing his hair out" while Dr. Dwyer went to his office and obtained ether to pour in the wound and kill the maggots.

■ The trial court obviously gave careful consideration to the question of damages and weighed the evidence in that regard before ordering the remittitur of $50,000. The remittitur ordered was substantial and constituted one fourth of the $200,000 verdict. The trial court saw and heard the witnesses and had the opportunity to observe the plaintiff throughout the week-long trial. The trial court was in a better position than we are to evaluate the testimony and to determine the effect of the injuries upon plaintiff. Where, as here, the trial court has considered the question of excessiveness and ordered a substantial reduction, we are usually reluctant to order a further reduction. Parlow v. Carson-Union-May-Stern Co., Mo.Sup., 310 S.W.2d 877. The evidence, considered most favorably to plaintiff, would seem sufficient to support the final judgment of $150,000 and, as we have indicated, that amount does not violate the rule of reasonable uniformity. At any rate, we are not in a position to so accurately determine the maximum amount for which a judgment should be permitted to stand in this case that we may confidently say that the

trial court abused its discretion in failing to order a remittitur in a larger sum. We accordingly rule that no further remittitur should be required.

■ The motion of respondent to dismiss the appeal because of appellants' alleged violation of S.Ct. Rule 1.08 is hereby overruled.

The judgment is affirmed.

## On Hearing En Banc.

### PER CURIAM.

In a supplemental brief filed after the transfer of this case to the Court en Banc the defendants attack the soundness of the ruling in the divisional opinion that the failure to negative contributory negligence in Instruction No. 1 was error which dealt with procedural rather than substantive law and hence that the ruling should be applied prospectively. We think that ruling is supported by the cases cited in the opinion. The manner in which issues involving substantive law are submitted to the jury, i. e., the form of an instruction, is a procedural matter. Dell'Aria v. Bonfa, Mo.Sup., 307 S.W.2d 479. The right of the defendants to have the defense of contributory negligence submitted to the jury involves a question of substantive law. That defense was fully submitted in three instructions. The question as to whether plaintiff's verdict-directing instructions should have been required to negative that defense relates to the manner of the submission of said defense and hence involves a question of procedural law. It therefore follows that the opinion was not erroneous in providing that said ruling be applied prospectively.

### PER CURIAM.

The foregoing opinion by HOLMAN, C., is adopted as the opinion of the court en Banc.

All concur.