Shelby Dean WILSON, a minor, by Henry
T. Wilson, his next friend,
Plaintiff-Respondent,

v.

Frank CADE, Defendant-Appellant.

No. 8219.

Springfield Court of Appeals.

Missouri.

Feb. 8, 1964.

Motion for Rehearing or to Transfer to Su-
preme Court Overruled March 5, 1964.

578

Dwight Crader, Sikeston, for defendant-appellant.

Gilmore & Dement, Kenneth L. Dement, Sikeston, for plaintiff-respondent.

RUARK, Presiding Judge.

This is an appeal by defendant Frank Cade from a verdict-based judgment obtained by plaintiff Shelby Wilson, by his father and next friend, Henry T. Wilson, on account of injuries sustained when the car in which Shelby was riding went into a drainage ditch.

The scene of the accident is a "T" intersection one-half mile south of the city limits of East Prairie, which we will take judicial notice (State v. Padgett, 316 Mo. 179, 289 S.W. 954) is a city of the fourth class. Martin Street runs north and south out of the main part of town. Its extension runs into an east-west county road to make the "T" intersection. The Martin Street extension has blacktop pavement twenty feet wide with dirt shoulders. The road it runs into at the "T" is also paved with blacktop, sixteen to eighteen feet wide, and also has dirt shoulders. The intersection does not appear to be banked in either direction.

Running south along the east side of Martin Street extension is an open drainage ditch. As it reaches the "T" intersection, it crosses under the road at an angle to the west, emerges on the other side of the east-west road and continues on south so that the west half of such emergent drainage ditch occupies approximately what would be the east half of Martin Street if such street had continued south past the intersection. At the point of emergence on the south side of the east-west road this ditch is about twenty-four feet wide at the top and ten feet wide at the bottom. It is five and one-half feet deep. North on Martin Street, apparently a short distance south of the city limits,[1] is a turn-off or entrance to a bridge coming in from the east. It is called the "project bridge."

The event which produces this lawsuit is that one Claude Ward (age sixteen) was driving south on Martin Street sometime after midnight on June 8, 1962. With him was plaintiff Shelby Wilson (age nineteen). The Ward car was being chased or followed by an East Prairie police car then being driven by defendant Frank Cade, a night policeman. Riding with Cade was another police officer, Martin Morgan. Plaintiff's case is that, at the "T" intersection, the Ward car was struck in the rear by the police car and caused to go out of control and into the drainage ditch, whereby plaintiff was injured.

There is some dispute in the evidence as to the antecedent activities of the parties. According to plaintiff's evidence, he and Ward, both residents of East Prairie, got together about seven p. m. They went some place near or in town to get a girl, but she did not accompany them. Then (they went) about two miles out of town to a "drive-in" where they saw a show, danced some, and returned to town about midnight; then to a truck stop west of town to see a friend about a tire pump (the friend was not there); then back to town to look for the friend; then to a drive-in restaurant, but nobody was there and they didn't stop. They went on out and turned around at a garage (unlocated) and

1. Plaintiff's witness Ward said this is "close to a mile" from the "T"; plaintiff said a quarter of a mile; a police officer testified it was four-tenths mile.

back through town to the four-way stop at Martin and Washington Streets; then south on Martin to where the mishap occurred.

Defendant's evidence, without relating details, is that the Ward car and another car were (in terms of the officers) playing "cowboy"—that is, accelerating rapidly, "squalling the tires," and exceeding the speed limit. The officers, by *their* (defendant's witnesses') testimony, had chased or followed the Ward car and the other car as the two proceeded around and through town and as they went out of town. Counsel for respondent refers to the activities of the officers as "cat and mouse" tactics. We think most of this evidence of preliminary activities is not pertinent; and, in any event, since we must accept the plaintiff's evidence as true, we discard *all* of it concerning these preliminary activities except as to that portion of plaintiff's evidence which may show familiarity with the streets and roads in and surrounding the City of East Prairie.

As to the specific event: The officers testified that they saw the Ward car (this time) proceeding on Washington Street and that as it turned south on Martin Street it accelerated very rapidly and they followed. From there on the stories vary widely. Plaintiff Wilson and driver Ward say that after they got on Martin Street they saw a car behind but supposed it was a friend and speeded up a little; that when they got in the vicinity of the "project bridge" they saw the flashing red light of the police car behind them and continued on south. Ward was driving sixty miles per hour or fifty-five to sixty miles per hour, but they never got over sixty miles per hour; the police car got as close as eight to ten feet and when Ward attempted to make the turn at the "T" the police car struck the rear of his car, the driver was thrown against some portion of the car, lost control, and the car went into the ditch. Plaintiff's witness Williams, who lived on Martin Street somewhere between the project bridge and the intersection, testi-

fied that a little after midnight he heard "a car come through with girls and kids screaming." This excited him, so he went out of the house and stood about fifty feet from the street. Within the space of three or four minutes two cars came by; one was an ordinary car, and close behind it, within six or seven feet, was a police car with a red light flashing on top. He heard a siren go on. The cars went on down toward the "T." He heard a kind of "dead" sound, and went down to the intersection and saw the Ward car sitting on its wheels in the drainage ditch south of the "T" headed southeast. The police car was parked nearby.

The testimony of the officers was that as they made the turn south off Washington Street onto Martin Street, the Ward car was at least two hundred fifty feet ahead. Appellant Cade says he drove the police car (a 1962 Chevrolet) as fast as it would go and never could get any closer. Various witnesses testified, and photographs were introduced to show, that the police car bore no scratch or mark of contact on its front or bumper.

Appellant contends that he is entitled to an outright reversal for failure to enter judgment because (a) the judgment is not supported by credible evidence and is contrary to the overwhelming weight, and the testimony of plaintiff and his witness Ward is so self-contradictory, inconsistent, and obviously perjured as to constitute no evidence that the police car struck the Ward car; and (b) plaintiff's evidence convicts him of contributory negligence as a matter of law.

As to the inconsistencies and contradictory evidence: Plaintiff's witness Ward, driver of the car, testified that as he got about to the city limits he was driving between twenty-five and thirty miles per hour. He saw headlights behind and "started moving out" a little faster. At about the project bridge he saw the flashing red light and just kept going. He said, "The radio was on and playing pretty loud. He [plaintiff] turned to me and said some-

thing. I don't know what he said. I wasn't listening to him or anything. I was more interested in watching the road." He said he did not see any reason to stop because he was past the city limits. When he saw the corner coming up, he hit his brakes and "just locked the wheels and started it to sliding, and as I started to cut the wheel of the curve, the police car hit me in the rear of the car * * *." " * * * he wasn't [pulling up beside me] and I started cutting the wheel and that is when he hit me." He was already skidding when the police car hit him. He did not speed up or slow down after he saw the police car behind him. In his deposition he testified that when he recognized the car behind as a police car, "I shoved the accelerator down and kept going." "Q. Were you still trying to outrun him when you got to the corner and tried to make that turn? A. Yes." "I hit my brakes once, and I raised up and saw I was too close to the corner, so I locked my wheels and started sliding, trying to make the corner. I got on the corner and started to cut my wheels. They hit me in the back. * * *"

Plaintiff Shelby Wilson's testimony in chief was substantially the same. He said "the cop" was eight or ten feet behind the Ward car when it started to turn. He said that (at some time which is not very clear but apparently about the time they passed the entrance to the project bridge) "I told him, 'Claude, slow down. The cops are behind us,' but the radio was on and I guess he didn't hear me." On cross-examination: "Q. Shelby, let me read some questions and answers to you and ask you if these were the questions that were asked you that day and whether or not this was your answer: 'Q. Did you cry out a warning or say anything to the driver of the car about the police car being back there? A. No, sir.' Was that your answer that day? A. It might have been but I still say I said what I said here. Q. On that day you said you didn't, is that correct? This was your answer that day? A. I guess so if that is what you've got down."

Doctors Bruce and Sargent, who were plaintiff's witnesses, treated plaintiff at the Sikeston Hospital after the collision. Dr. Bruce testified he asked him how the accident happened. Plaintiff told him he was in a car which was being chased by a police car and ran into a ditch. He did not recall plaintiff's mentioning anything about the automobile being struck by a police car. Plaintiff told Dr. Sargent "that they were in a car accident, that they failed to negotiate a turn." Defendant's witness Trooper Norman Copeland testified that the next morning at the hospital in Sikeston he inquired of Ward as to what caused the accident and Ward said that he saw the police car, decided to outrun it, and in so doing, "failed to make this curve and a 'T' intersection and went off into the ditch." Ward said nothing to him about the police car hitting his car. This testimony was, however, impeached by the testimony of Buford Ward, father of driver Ward, who said he heard the interview and driver Ward told the trooper "something hit us" at the corner.

In a jury-tried case we must give the prevailing party the benefit of all favorable evidence which is not at war with his theory of the case and discard that which is opposed. In our review we must assume as true all supporting evidence which is not contrary to known physical laws, and if there is evidence to support the plaintiff's case concerning which reasonable men might disagree, we are bound by it in determining whether plaintiff made a submissible case. The credibility of witnesses and the weight of the evidence is primarily with the jury and secondly with the trial court. Calvin v. Lane, Mo.App., 297 S.W. 2d 572; Scrivner v. American Car & Foundry Co., 330 Mo. 408, 50 S.W.2d 1001; Stanziale v. Musick, Mo., 370 S.W.2d 261. Thus, regardless of any possible inconsistencies in the testimony of Ward or any contradictions in the version he might have given other persons, or strongly disputing evidence to the contrary, we must assume that the police car was being driven within

a short distance behind the Ward car and that it struck such car as Ward was attempting to make the turn at the "T" intersection.

 The mere showing of contradictory statements at other times does not alone and of itself necessarily prove perjury, although it does go to the credibility. Loveless v. Locke Distributing Co., Mo., 313 S.W.2d 24; see Whalen v. St. Louis Public Service Co., Mo.App., 351 S.W.2d 788, and Calvin v. Lane, supra, Mo.App., 297 S.W.2d 572. As to whether plaintiff cautioned the driver Ward to slow down: He testified he did, although it would appear that his deposition testimony was to the contrary. It is held that a party is not conclusively bound by his previous testimony under oath by the way of deposition. Moore v. Ready Mixed Concrete Co., Mo., 329 S.W.2d 14; Parmley v. Henks, Mo., 285 S.W.2d 710; Leek v. Dillard, Mo.App., 304 S.W.2d 60; Smith v. Trans World Airlines, Inc., Mo.App., 358 S.W.2d 91; Bowman v. Ryan, Mo.App., 343 S.W.2d 613. As to whether a clear, plain, and unequivocal statement made by a party in deposition, concerning his own act and as to whether or not he did a certain thing, which such statement does not in any manner involve an expression of opinion, estimate, or judgment and which such statement is not explained in any manner, could ever be classed as a quasi-judicial admission which would bind the declarant; or whether it would fall within the rule which cancels out both versions as having no probative value (see Wood v. Ezell, Mo. App., 342 S.W.2d 503, and cases at footnote 1), we do not have to decide, because the deposition itself was not put in evidence and the plaintiff did not admit he made the statement. The nearest he came to so doing was in answering the inquiry, "This was your answer that day?", "I guess so if that is what you've got down." So, we must *assume* that Wilson did caution the driver to slow down, but the radio was playing "pretty loud" and the driver did not hear him.

There remains the question of whether the statement made by plaintiff to the driver, " 'Claude, slow down. The cops are behind us,' but the radio was on and I guess he didn't hear me," under the circumstances so related, discharged the duty which plaintiff owed to relieve himself from negligence or assumption of risk.

 The general rule is that when dangers which are either reasonably manifest or known to the guest confront the driver and the guest has an adequate and proper opportunity to influence the situation for safety, if he sits by without warning or protest and permits himself to be driven carelessly to his injury, this is negligence which will bar recovery. Kaley v. Huntley, 333 Mo. 771, 63 S.W.2d 21; Hieber v. Thompson, Mo.App., 252 S.W.2d 116, 120; Ketcham v. Thomas, Mo., 283 S.W.2d 642. The standard to be applied is that the guest is bound to take such action as an ordinarily or reasonably prudent and careful person would take under the same or similar circumstances. Happy v. Blanton, Mo., 303 S.W.2d 633; Brooks v. Mock, Mo., 330 S.W.2d 759; Ledkins v. Missouri-Kansas-Texas R. Co., Mo., 316 S.W.2d 564. The plaintiff's situation and duty must be considered as of the time the danger presented itself, and this involves a consideration of all the surrounding circumstances. Each case must stand on its own facts. Fann v. Farmer, Mo.App., 289 S.W.2d 144; Knox v. Weathers, 363 Mo. 1167, 257 S.W. 2d 912. As stated in Blashfield—Cyclopedia of Automobile Law and Practice, § 2414, p. 571, "The end which the law seeks in imposing the duty of protest upon the passenger is to induce the driver to discontinue operating the automobile in a manner likely to be productive of injury."

 There is no dispute that the police car was a vehicle owned by the City of East Prairie and operated by the Police Department. It was an "emergency vehicle" within the definition of Section 304.022 [3(1)], V.A.M.S. Paragraph one of the same section provides that upon the immediate ap-

proach of such an emergency vehicle (giving the proper signals by lights or siren), the driver of every other vehicle shall yield the right-of-way and *immediately* drive to a position parallel to and as far to the right of the traveled portion of the highway and there stop and remain until the emergency vehicle has passed. We think this statute recognizes the dangers to all persons on the highway due to speed, possible assumption of right-of-way, and the likelihood of confusion caused by the approach and passage of such a vehicle, and imposes a duty upon the drivers of all vehicles irrespective of whatever may, or may not, be the licenses, privileges, and duties of the operators of vehicles answering the definition and description of emergency vehicle.

■ Thus we have two circumstances, both apparent to plaintiff, which cry out for caution: (a) the immediate approach of an emergency vehicle (at least) flashing its red light signal, which circumstance demanded the immediate pulling to the right and stopping; (b) the approach to a square, unbanked "T" intersection at a speed of sixty (or fifty-five to sixty) miles per hour, which circumstance required a decided lessening of speed. Plaintiff was under a duty to do what a reasonable person in his position would have done to so influence the situation as to lessen the danger. We have two difficult questions: (a) Was the admonition he says he gave to the driver in competition with the loud-playing radio sufficient? The duty to warn or protest in this instance required the taking of such steps as were reasonably calculated to convey warning and protest to the senses of the driver, for an uncommunicated protest is *no* protest. (b) *Assuming* it was a jury question whether the passenger took reasonable steps to give warning or protest in the first instance, then when it became reasonably apparent that his communication had not affected the sixteen-year-old driver (whether it reached him or not) and the car was rushing toward the "T" intersection (with a deep ditch on the other side) at a speed of sixty miles per hour, did it become in-

cumbent upon the passenger to take further steps to "influence the situation" for his own safety? The nearer the intersection approached, the greater became the urgency which called upon any reasonable man who had any regard for his own safety to make some effort, by outcry or by other means, in the imperative need to change the circumstances which were fraught with possibility of disaster. We think, without attempting to specify, that there were a number of things which plaintiff reasonably *could* have done to convey a warning and protest, none of which were done or attempted to be done. We think all reasonable men would say that the failure to do anything was a failure to use the care which an ordinarily prudent person would exercise in the circumstances, and, therefore, that plaintiff's own evidence shows that he was guilty of contributory negligence as a matter of law. The judgment is reversed.

STONE and HOGAN, JJ., concur.